UNITED STATES, Appellee

v.

LLOYD GIBSON, Private, U. S. Army, Appellant

3 USCMA 746, 14 CMR 164

747

748

No. 1474

Decided February 19, 1954

Lt Col Herman P. Goebel, Jr., U. S. Army, and 1st Lt Patrick H. Thiessen, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, Lt Col Chayer Chapman, U. S. Army, and 1st Lt Bernard A. Feuerstein, U. S. Army, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

A general court-martial convicted the accused of four specifications alleging housebreaking, in violation of Article 130, Uniform Code of Military Justice, 50 USC § 724, and four specifications alleging larceny of sums each less than $20.00, in violation of Article 121 of the Code, supra, 50 USC § 715. The convening authority disapproved the findings on one specification of each charge, and substantially reduced the period of confinement. Otherwise the findings and sentence were approved. An Army board of review affirmed the findings and sentence as modified by the conven-

749

ing authority. On petition of the accused, this Court granted further review to consider two questions, the nature of which will appear as we proceed.

The facts upon which the approved findings were based are as follows. During the night of February 11, 1952, three buildings occupied by the Department of Motors at Fort Sill, Oklahoma, were forcibly entered, and the contents of the coin boxes of automatic vending machines located therein were rifled. On the night in question, the accused was a member of the guard detail assigned to the area, and the buildings entered were located upon his post. When it was discovered that he had been observed with a large quantity of coins in his possession, some of which he exchanged for bills, he was apprehended and put in confinement.

After evidence of the foregoing facts had been introduced at the trial, the prosecution produced one Private First Class Jimmie Ferguson, an inmate of the barracks to which the accused was assigned upon his confinement. Since he had known the accused during the course of a previous confinement, Ferguson asked him, he testified, why he was confined. The accused then volunteered the information that he had done "a little job" while on guard duty at the Department of Motors, and later furnished most of the details of the unlawful entries and larcenies. Of course, Ferguson did not preface his question by the warning described in Article 31 (b) of the Code, supra, 50 USC § 602. Thereafter, the witness testified, he was asked by the provost sergeant, Sergeant Foster, whether the accused had made any statements concerning the offenses. Ferguson then reported the accused's statement to him, and he was referred to the Criminal Investigation Division.

The law officer advised the accused of his right to present evidence as to the voluntary nature of the statements testified to. The accused elected to remain silent, and offered no evidence on the question. The statement was then received over objection of the accused. Testifying upon the merits, the accused denied having made any statement to Ferguson, and denied all complicity in the crimes. After the defense had rested, the provost sergeant was called as a witness at the direction of the court. In his testimony is found the heart of the first question.

This witness testified that when the accused was confined he had been instructed by representatives of the Criminal Investigation Division to assign another prisoner to watch the accused. The representative recommended that "a good reliable rat" be selected for the purpose, and, in the words of the sergeant, "Ferguson qualified better than anyone I knew." Further instructions were given to permit Ferguson to visit the Division whenever he requested. In compliance with these instructions, Sergeant Foster assigned Ferguson to the accused's barracks, but he did not tell him what type of information was expected. Ferguson did not report any information to him, but he was sent to the Division upon their request.

The accused now contends that since Ferguson was an agent of the Criminal Investigation Division, any statement obtained by him was procured in violation of Article 31 (b) of the Code, supra, for, admittedly, no preliminary warning had been given.

Although this contention is founded upon a fact in issue at the trial, we believe the evidence permits no conclusion other than that Ferguson was placed near the accused at the direction of agents of the Division for the sole purpose of procuring incriminating statements. The accused was unaware of Ferguson's connection with the authorities, and any incriminating statements were made in the course of what on its face was an ordinary conversation between inmates of a stockade. No question of coercion, unlawful influence, or unlawful inducement is presented.

The first question raised is thus narrowed down to whether the absence of a warning precludes the use of the accused's statement under the circumstances of this case.

In criminal trials before both civil and military tribunals the principal purpose of all evidence is to establish the facts in issue. While a number of rules govern the admissibility of evi-

dence, basically all are predicated upon this purpose. The rules governing the admissibility of confessions present a striking example of the reliance of procedural regulations upon logical trustworthiness. State v. Palko, 121 Conn 669, 186 Atl 657. Confessions involuntarily obtained are excluded from evidence, not solely because their procurement violates the constitutional privilege against self incrimination, but also because being so obtained they are untrustworthy. Thus, the principle upon which such a confession is excluded is its lack of logical tendency to establish a fact in issue. Wigmore, Evidence, 3d ed., section 822. This basis for excluding involuntary confessions was adopted by the military system at an early date, as indicated by Winthrop's Military Law and Precedents, 2d ed., 1920 Reprint, page 328:

"But the most familiar requisite to the admissibility of a confession is that it must have been *voluntary;* and the *onus* to show that it was such is upon the prosecution in offering it. A confession is, in a legal sense, 'voluntary' when it is not induced or materially influenced by hope of release or other benefit, or fear of punishment or injury, inspired by one in authority; or, more specifically, where it is not induced or influenced by words or acts,—such as promises, assurances, threats, harsh treatment, or the like,—on the part of an official or other person competent to effectuate what is promised, threatened, &c, or at least believed to be thus competent by the party confessing. *And the reason of the rule is that where the confession is not thus voluntary, there is always ground to believe that it may not be true.*"

In the civilian sphere, generally, confessions made to law enforcement authorities by one not shown to be aware of his right to remain silent, and of the fact that anything he may say may be used against him, are viewed with circumspection. Under these circumstances, it has been recognized that the safer and better course is to require that each and every person interrogated be advised of his rights. United States v. Kallas, 272 Fed 742 (CA 9th Cir). In every case, the question of warning has been held to relate to voluntariness. While courts have recognized a requirement of warning to be the preferable rule, nevertheless, in the absence of statute, warning is not an indispensable requisite to admissibility. United States v. Kallas, supra; Gerad v. United States, 61 F2d 872 (CA 7th Cir) ; Wagner v. State, 43 Ariz 560, 33 P2d 602; Commonwealth v. Buck, 285 Mass 41, 188 NE 613.

The development of this phase of criminal law has followed a similar course in the military system, where the effect of authority and the influence of superior rank or official position are readily discernible—Winthrop's Military Law and Precedents, supra, page 329. While no inflexible requirement that a warning precede any questioning of a person suspected or accused of an offense existed prior to the 1948 revision of the Articles of War, yet, in the absence of a warning, self-incriminatory statements of any accused were excluded unless voluntariness was otherwise clearly shown. Manual for Courts-Martial, U. S. Army, 1917, paragraph 225; Manual for Courts-Martial, U. S. Army, 1928, paragraph 114a. The basis for this rule was described by an Army board of review in United States v. Rodriquez, 69 BR 289, 292, as follows:

"In the application of the general rule that confessions which are not voluntarily made should not be received in evidence in military cases consideration should be given to the fact that a confession made by a soldier to a military superior is likely to be involuntary for the reason that relationship of rank has a bearing on the strength of any inducement that may have been offered. In addition, it must be considered that there is an implied command, and consequently an element of presumptive coercion, whenever a military superior asks a question of a subordinate who either does not know, or has not been warned of, his privilege against self-incrimination."

However, when it affirmatively and

clearly appeared, that the disparity in rank had no effect upon the making of a statement, the fact that no warning was in fact given has been held immaterial. United States v. Hummel, 81 BR 349, 356.

When revision of the Articles of War was under consideration by Congress, Representative Burleson, offered an amendment to the changes proposed by the House Committee on Armed Services, requiring a warning be given to one charged with an offense. This amendment was adopted and became a part of Article of War 24, 10 USC § 1495. The extent of its application was not limited to situations in which military rank alone was involved. Rather the view adopted by many civilian jurisdictions prompted the requirement, and the consideration of "officiality" was placed on an equal plane with rank. At the time the amendment was offered, Representative Burleson explained:

". . . I feel that when anyone authorized to take statements from an accused interrogates him for that purpose that he should tell the accused that any statement he makes may be used against him on the trial of the offense with which he is charged."

Article 31(b), supra, extends the provisions of its predecessor, Article of War 24, supra, to persons ▮ "suspected" as well as "accused," but no intention to extend the requirement to other than "official investigation" is found in the legislative history of the Uniform Code. The Article provides:

"No person subject to this code shall interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

Taken literally, this Article is applicable to interrogation by all persons included within the term "persons subject to the code" as defined by Article 2 of the Code, supra, 50 USC § 552, or any other who is suspected or accused of an offense. However, this phrase was used in a limited sense. In our opinion, in addition to the limitation referred to in the legislative history of the requirement, there is a definitely restrictive element of officiality in the choice of the language "interrogate, or request any statement," wholly absent from the relatively loose phrase "person subject to this code," for military persons not assigned to investigate offenses, do not ordinarily interrogate nor do they request statements from others accused or suspected of crime. See United States v. Wilson and Harvey, 2 USCMA 248, 8 CMR 48. This is not the sole limitation upon the Article's applicability, however. Judicial discretion indicates a necessity for denying its application to a situation not considered by its framers, and wholly unrelated to the reasons for its creation.

Such a situation is presented in this case. Careful consideration of the history of the requirement of warning, compels a conclusion that its purpose is to avoid impairment of the constitutional guarantee against compulsory self incrimination. Because of the effect of superior rank or official position upon one subject to military law, the mere asking of a question under certain circumstances is the equivalent of a command. A person subjected to these pressures may rightly be regarded as deprived of his freedom to answer or to remain silent. Under such circumstances, we do not hesitate to reverse convictions whenever the accused has been deprived of the full benefit of the rights granted him by Congress. See United States v. Wilson and Harvey, supra; United States v. Rosato, 3 USCMA 143, 11 CMR 143. By the same token, however, it is our duty to see to it that such rights are not extended beyond the reasonable intendment of the Code at the expense of substantial justice and on grounds that are fanciful or unsubstantial.

In the instant case, the accused's

statement was made to a fellow prisoner in the course of a conversation between equals. It followed upon the very usual question, "What are you in for?" No one could reasonably infer from any of the surrounding circumstances that the accused was placed in such a position as to compel a reply to questions asked by Ferguson. The voluntariness of his statement is beyond question.

There remains to be considered, then, only whether the deceit practiced by Ferguson and the agents of the Division in concealing Ferguson's official position, requires the exclusion of the statement. Upon this point, civilian courts appear to be unanimous in holding that fraud or deceit negatives admissibility only when the nature of the fraud or deceit is calculated to elicit an untrue statement. Thus, it has been held that a detective may be placed in confinement with another for the sole purpose of gaining his confidence and obtaining incriminating statements. The ruse, while frequently deprecated by the courts, is nonetheless permitted. People v. Lipsczinska, 212 Mich 484, 180 NW 617, 622; Burton v. State, 107 Ala 108, 18 So 284; State v. Brooks, 92 Mo 542, 5 SW 257, 330; Heldt v. State, 20 Neb 492, 30 NW 626; Commonwealth v. Flood, 152 Mass 529, 25 NE 971; People v. Scott, 195 NY 224, 88 NE 35.

There is nothing in the history of Article 31(b) which calls for a conclusion at variance with the results obtaining in civilian jurisdictions.

We conclude from the foregoing that the provisions of Article 31(b), supra, do not apply to this situation. It follows that the confessions were properly before the court despite the absence of a preliminary warning.

The accused's final contention is that there was an unreasonable multiplica-tion of charges against him. Our answer need not be lengthy. He stands convicted of six offenses, to wit: breaking into three different buildings, and committing three distinct larcenies, one in each of the three buildings. Better examples of separate offenses can hardly be imagined. This is not at all the situation comprehended by paragraph 26b of the Manual, supra, which admonishes against an unreasonable multiplication of charges as to "one transaction, or what is substantially one transaction."

The decision of the board of review is affirmed.

BROSMAN, Judge (concurring):

I concur in the views of the author of the principal opinion. Each of my brothers has construed Article 31(b) to apply only if an element of officiality attaches to the interrogation of a person accused or suspected of a crime. In doing this, each—because of the purpose revealed in the legislative background of Article 31(b)—has chosen to read into that enactment something not clearly visible in its verbiage. Nowhere do I find an express statement in the Uniform Code that Article 31(b) deals only with persons subject to the Code who are engaged in an *official* investigation. Yet I have no sort of quarrel with the practice of examining legislative history to ascertain the purpose of Congress in enacting a statute. Nor is such a procedure alien to recognized canons of statutory construction.[1]

Once having committed myself to the notion of interpreting Article 31(b) in this manner, I am compelled to accept the result offered by the Chief Judge —since I am convinced that Congress was concerned principally with the possibility of implied coercion due to military discipline and superiority, rather than with suppressing the use of statements obtained through trick-

---

[1] Cf. United States v. Five Gambling Devices, 346 US 441, 98 L ed —, 74 S Ct 190; Switchmen's Union of N.A. v. National Mediation Board, 320 US 297, 88 L ed 61, 64 S Ct 95; Harrison v. Northern Trust Co., 317 US 476, 87 L ed 407, 63 S Ct 361; United States v. Wrightwood Dairy Co., 315 US 110, 86 L ed 726, 62 S Ct 523; Boston Sand and G. Co. v. United States, 278 US 41, 73 L ed 170, 49 S Ct 52.

ery. Judge Latimer's view appears to be that, while officiality must exist to justify an invocation of Article 31(b), it will suffice if the questioner alone is aware of this officiality. Judge Quinn, on the other hand, and contemplating an "implied coercion" criterion, would require in addition that the person questioned have reason to be aware of the official character of the interview. In no way is this approach a legal anomaly. For instance, who would conceive that the accused here might successfully be prosecuted under Article 107, 50 USC § 701, for having made a false official statement, had he intentionally deceived his fellow-prisoner, Ferguson—this even though the latter, unknown to the accused, had been in reality an official full-time agent of the Criminal Investigation Division at the time of the interrogation? Similarly, Judge Quinn reasons that the goal of Article 31(b) in no wise demands warning, if there be no rational possibility that an accused or suspect would harbor a belief that the inquirer was engaged in some type of official investigation.

## II

In the Federal criminal procedure of the civilian scene it is not normally required that, prior to interrogation, even an accused be warned of his right to remain silent, or that he be informed of the charge against him. In those instances in which warning has been required, or adverted to, the focus of attention has always been on possible "compulsion" arising from circumstances. See, e.g., United States v. Kallas, 272 Fed 742 (CA 9th Cir). The Supreme Court has also dealt with the presence or absence of warning to an accused as amounting to no more than a factor in determining the validity of a claim that a confession had been coerced. See, e.g., Turner v. Commonwealth of Pennsylvania, 338 US 62; Harris v. South Carolina, 338 US 68, 93 L ed 1815, 1816, 69 S Ct 1354, 1357. The Federal Rules of Criminal Procedure demand that an arrested person be taken without unnecessary delay before the nearest available United States Commissioner, who is required to advise the accused of his right to retain counsel,

and to remain silent. In addition, the Commissioner must inform him of the nature of the complaint, and should indicate that any statement made may be used against him. Federal Rules of Criminal Procedure, Rule 5. Yet the clear objective of this Rule seems to be an avoidance of intangible coercion resulting from arrest and confinement, as well as the discouragement of "third degree" tactics. See McNabb v. United States, 318 US 332, 87 L ed 819, 63 S Ct 608. Thus, statements obtained by Federal law enforcement officers, although secured without a prior warning to the accused of his rights, are admissible, *if* there has been no unnecessary delay in bringing about the hearing before a Commissioner. United States v. Mitchell, 322 US 65, 88 L ed 1140, 64 S Ct 896; Symons v. United States, 178 F2d 615 (CA9th Cir); Mergner v. United States, 147 F2d 572 (CA DC Cir). It may be reasonably inferred that Congress did not consider a warning to be a *sine qua non,* but rather a precautionary measure introduced for the purpose of counteracting the presence of confinement, or other circumstances, which might operate to deprive an accused of his free election to speak or to remain silent.

In England, Judges' Rule No. 3 prescribes that a "caution" be given a suspect. Yet the trial judge retains much discretion, and his reception of a statement, secured without warning, will not constitute ground for reversal, unless the record reveals that the statement was involuntary in origin. Rex v. Straffer, 2 QB 911; Rex v. May, 36 Cr App R 91; Rex v. Voisin, 13 Cr App R 89; Rex v. Wattam, 36 Cr App R 72. From this I conclude that the English courts also associate the need for warning with the objective of securing voluntariness, and that they would not deem a warning necessary if, as in the instant case, there is no slightest likelihood of involuntariness.

Texas is the only American state which requires that a warning be afforded a person under arrest before any statement is taken. Clearly this measure seems directed to the coercive pressures inherent in arrest. Moreover, in Texas it is held that a statement is

admissible if therein are contained representations of fact and circumstances which have been verified and conduce to establish guilt. Silver v. State, 110 Tex Cr R 512, 8 SW 2d 144. Such events as the finding of secreted or stolen property, referred to in a confession, are deemed to evince its trustworthiness, and, in accord with a Texas statutory principle, to permit the confession's reception in evidence. Wade v. State, 93 Tex Cr R 364, 248 SW 382. If, as under the Texas view, the trustworthiness of the confession is the only matter for consideration, there is little reason to exclude from evidence the accused's statement in the case before us now—for no slightest inkling of involuntariness clouds its credit.

## III

For some time, it has been recognized that in the military system there exist certain pressures of authority and rank which conceivably may deprive an individual of his mental freedom to choose between speaking and remaining silent. See, e.g., Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 329. Accordingly, it was stated that:

> "Considering the relation that exists between officers and enlisted men and between an investigating officer and a person whose conduct is being investigated, it devolves upon an investigating officer, or other military superior, to warn the person investigated that he need not answer any question that might tend to incriminate him." [Manual for Courts-Martial, U.S. Army, 1921, paragraph 22*j*. Cf. Manual for Courts-Martial, U.S. Army, 1928, paragraph 114; Manual for Courts-Martial, U. S. Army, 1917, paragraph 225.]

A glance at the legislative history of the warning requirement, first enacted by Congress in 1949 as a part of Article of War 24, reveals that Congressional concern, too, had to do with the possibly subtle effects of military position and habits of obedience in inducing an accused to respond to questions relating to an alleged offense. See Congressional Record, Vol 94, part 1, 80th Congress, 2d Session, January 14, 1948, pages 184–5. Accordingly, Article of War 24 was not construed to apply in instances where an incriminating statement amounted to no more than a response to a casual question—for the reason that the spontaneity of the statement prevented it from being "obtained" within the meaning of the language of that Article. United States v. Sonnenschein, 4 CMR (AF) 778. Cf. United States v. Hoover, 3 BR–JC 39.

The necessity for regarding Article 31(*b*) as having been designed to provide a counteragent for possible intangible "presumptive coercion," implicit in military rank and discipline, is suggested by the background in which it was framed. Cf. United States v. Franklin, 8 CMR 513. Moreover, that it should be limited to that purpose is a conclusion compelled by the dangers latent in the approach proposed by Judge Latimer. In the first place, this interpretation will inescapably deny admissibility to statements obtained by investigative agents who are "planted" in criminal locales in the hope that they may obtain information concerning suspected offenses. Any question put by such an agent would necessarily require a prefatory warning in order to insure compliance with Article 31(*b*)— a warning which, in some instances, might prove fatal to the person expressing it. An informer's disclosures would likewise be inadmissible in trials by court-martial if those disclosures were secured through the direction of inquiries to persons suspected of offenses. In instances of continuing conspiracy for illicit purposes, such as drug-peddling or theft of Government property, it would seem that informers, or other persons utilized as decoys, would be unable to elicit disclosures of inculpatory information, of even the utmost voluntariness, without prior warning.

Since the term "statement" in Article 31 embraces not only words but also conduct which has incriminatory significance, the ramifications of Judge Latimer's interpretation are even broader.

**755**

This unfortunate construction apparently envisages that Government agents must, in effect, identify themselves as such before obtaining any sort of incriminatory admission from a suspect—with the result that, to be admissible in evidence, an inculpatory statement can only proceed from a conscious and knowing determination on the part of the suspect to "tell all" and to "pay his debt to society." Accordingly, many ruses would lose their utility. For example, a decoy letter is designed normally to discover incriminatory conduct on the part of some one of a group of suspects, and thus might well be included within Judge Latimer's apparent construction of "requesting" a statement. Consequently, I am afraid that under the logic of his view information secured by the decoy letter would be inadmissible unless on the envelope were printed an Article 31 warning together with a statement of the nature of the crime the decoy was being used to detect. Indeed, a curious dichotomy in result would appear to exist as to intentional misrepresentations of fact by a Government agent, following identification as such, on the one hand, and, on the other, statements obtained through concealment of the status of the questioner as one officially connected with a law enforcement agency. Certainly the former sort of "trickery" does not usually affect admissibility.[2]

Probably the most noxious result of all under Judge Latimer's interpretation is that, as I read Article 98 of the Code, 50 USC § 692, informers, "plants," or investigators who use decoys of various types, might well be subjecting themselves to trial by court-martial. In consequence, and somewhat anomalously, criminals would often be running free, while investigators who, in pursuit of the former, utilized tactics recognized and approved in *every* civilian jurisdiction might be facing confinement. Moreover, under this construction of Article 31, a "stool pigeon," if kept in ignorance by an investigative agency of the purpose for which he is being used, may testify at will, whereas a "planted" Government agent may not—and might find himself facing punishment as a law violator. I cannot at all comprehend why the latter measure of detection should have been deemed more reprehensible by Congress—if, as I doubt, either measure was so viewed. Nor can I understand why a premium should be placed on the use of innuendo, doubletalk, and concealment of purpose, in dealing with informers, when from an accused's standpoint, the effects of both practices mentioned above are identical.

IV

Only slightly less incongruous, is the contrast between the result reached by Judge Latimer and the view taken by other jurists. By way of example, Judge Learned Hand was recently required to pass on the claim of eleven convicted Communists that the use of testimony by Government "plants," and Federal Bureau of Investigation agents, was improper. Not even the Communists appear to have contended that the agents were themselves subject to criminal liability! The opinion of the United States Court of Appeals for the Second Circuit contained the following language:

". . . Courts have countenanced the use of informers from time immemorial; in cases of conspiracy, or in other cases when the crime consists of preparing for another crime, it is usually necessary to rely upon them or upon accomplices because the criminals will almost certainly proceed covertly. Entrapment excluded, of which there was none here, decoys and other deception are always permissible." [United States v. Dennis, 183 F2d 201, 224, *aff'd*, 341 US 494.]

In addition, one of the most recent wire-tapping cases from the Federal judicial system reveals a construction of the Communications Act which certainly and properly facilitates the work of informers and covert Government agents. United States v. Sullivan, 116 F Supp 480. Federal cases, and of

---

[2] State v. Hofer, 238 Iowa 820, 28 NW2d 475; Flowers v. State, 152 Fla 649, 12 So2d 772; Wigmore, Evidence, 3d ed, § 841; Inbau and Reid, Lie Detection and Criminal Interrogation, 3d ed. pages 222–3.

course innumerable state decisions, sanction warmly the use of decoys and informers in a galaxy of investigative situations—for instance, those involving detection of postal frauds, narcotics offenses, bootlegging, white slavery, and subversives. In no wise atypical is the statement: "It has been long established that the use of decoys and informers is legitimate." Price v. United States, 56 F2d 135 (CA 7th Cir). Indeed, Holy Writ serves me here, for Moses, I believe, made use of secret agents before the entry of the Children into Canaan—and quite without reported criticism from any source. Numbers 13:2.

Certainly the types of crime which have required the use of decoys, informers, and "plants" in the civilian scene are not alien to the military service. Why then should Congress have felt that a distinction must be drawn in this particular between civilian and military investigation? No peculiarly military problem of "presumptive coercion" can possibly be involved—for the very sound reason that the utility of the tactic under scrutiny depends obviously on the *concealment* of any element of officiality which might tend to create coercion. While there is a persuasive social interest in preserving mental freedom—an interest recognized in the Fifth Amendment's dictate that no person shall be *compelled* to be a witness against himself—what is the comparable strong interest which dictates a protection of the individual who, of his unimpaired volition, talks too much and not wisely? I can think of none. I see no sort of reason in basic policy why Article 31(b) should have been intended by Congress to touch the type of matter with which we are now concerned—and nothing whatever in the legislative background which suggests that it was so intended. Indeed, the element of ritual and formality inherent in words like "request" and "interrogate," as used in Article 31(b), to me indicates with clarity that Article 31(b) was not designed to touch the casual and informal context in which Ferguson and the accused conversed. Cf. Webster's New Collegiate Dictionary, 1949 ed, synonyms listed under the word "ask," page 52.

V

In conclusion, I cannot ascribe to Congress—without a substantially more positive indication than I am afforded here—a wish to outlaw practices which are elsewhere sanctioned, and even affirmatively approved, in the investigation of crime. In the absence of clearer evidence than I have been able to secure, I simply cannot believe that Congress intended to require a procedure which renders those practices wholly unfeasible—and to assess against their use the penalties of Article 98, supra. Nor am I disposed, like Canute, to seek to "punish" the draftsmen of Article 31(b), for their failure to make its intendment more lucid. Indeed, the brunt of such punishment—if any—would fall, not on the Code's draftsmen, but rather on the back of the non-culpable military investigator of crime, and on agencies charged with the maintenance of discipline and the protection of the national security. In this matter, which I consider of gravest import to the Armed Services, I cannot accept an approach which interlineates a statute, but chooses to discard the only interpretative gloss which would accord with the purposes and historical background of the legislation involved.

LATIMER, Judge (concurring in the result):

Because my associates concur in a principle which results in a classic example of judicial legislation, I feel it advisable, before setting out my reasons for concurring, to point out areas of disagreement. Much, and most of it imaginary, has been said about the noxious results of my concepts, but they speak for themselves. I would, however, suggest that a rule which grants to an informer the right to violate a statute which controls other members of the armed services is so repugnant to the ordinary concepts of common sense that it ought to be struck down and never revived. While I neither commend nor condemn the use of undercover agents, I see no reason to place

them in an exalted position. Their conduct should, at least, be governed by principles controlling others and, because they can deceitfully conceal their identity by changes in apparel, should not be good cause to exempt them from complying with the law.

Perhaps the principal misconception in the Court's opinion is that if we interpret the provisions of the Manual to include undercover agents, we thereby preclude their use by the Government. Of course, that is not true. We merely prevent them from obtaining evidence by interrogation. From my limited experience with their operations, I believe they can be used effectively if they listen, observe, and report. It is only when they seek to obtain a confession or admission by questioning an accused that they run afoul of the provisions of Article 31 of the Code, 50 USC § 602. I fail to see why their employment, unfettered by that Article, is of such importance that they are permitted to destroy a fundamental right accorded to an accused. If they can ignore the warning provision of that Article, then members of the Criminal Investigation Division should go underground to carry on their activities. In that way, they can mold the rule of evidence and emasculate the statute. No one disputes the fact that undercover agents have long been in use in crime detection and I am willing to conclude that members of Congress were well aware of their employment. For that reason, I believe that had members of Congress intended to free them from the restrictions of Article 31, the Code would have so stated. Congress did not see fit to grant them special privileges and I am unwilling to warp the provisions of the Code for their benefit. Necessity may actuate Congress in legislating for their use; but it should not influence us to rewrite a statute.

Another misconception I find in the opinions of my associates is that voluntariness is the touchstone by which we measure those cases. That theory does not find root in the Code, the Manual, or in our decisions. In my concurring opinion in United States v. Josey, 3 USCMA 767, 14 CMR 185, I set forth

some of my views for concluding that failure to warn and involuntariness are separate and distinct bars to the admission of evidence. However, I believe it advisable to set forth other reasons which compel my belief that the two concepts must be disassociated. In doing so, I shall develop briefly the history of Article of War 24, 10 USC § 1495, which is the predecessor of Article 31 of the Uniform Code. For that purpose I shall commence with Article of War 24 as it existed in 1928. At that time the Article provided as follows:

"No witness before a military court, commission, court of inquiry, or board, or before any officer conducting an investigation, or before any officer, military or civil, designated to take a deposition to be read in evidence before a military court, commission, court of inquiry, or board, or before an officer conducting an investigation, shall be compelled to incriminate himself or to answer any question the answer to which may tend to incriminate him, or to answer any question not material to the issue when such answer might tend to degrade him."

At that time, failure to warn and involuntary confessions were unmentioned in the Article. However, the Manual recognized the rule of law dealing with the exclusion of involuntary confessions and it provided for their inadmissibility. With only one principle recognized, it goes without saying that there was no blending of the two. The Manual for Courts-Martial, U. S. Army, 1949, shows Congress adopted Article of War 24, but it added one additional paragraph which is as follows:

"The use of coercion or unlawful influence in any manner whatsoever by any person to obtain any statement, admission or confession from any accused person or witness, shall be deemed to be conduct to the prejudice of good order and military discipline, and no such statement, admission, or confession shall be received in evidence by any court-martial. It shall be the duty of any person in ob-

taining any statement from an accused to advise him that he does not have to make any statement at all regarding the offense of which he is accused or being investigated, and that any statement by the accused may be used as evidence against him in a trial by court-martial."

It is to be noted that the 1949 amendment for the first time introduced into military law the requirement that a warning must be given to an accused before taking any statement from him. It is further to be noted that that Article made the use of coercion or unlawful influence in obtaining a statement conduct to the prejudice of good order and military discipline. The Act is significantly silent about the conduct of one who fails to warn. In addition, the amendment provided that any statement which was involuntary should not be received in evidence. Again the Act is silent as to the admissibility of a statement given without warning. The drafters of that Manual must have considered the two as separate cloaks of protection for an accused and governed by different rules.

The Congressional committee, who prepared the present Code, gave considerable thought to further amending Article of War 24 and their conclusions are expressed clearly in the present wording of the Code. They broadened the base of the former Article of War and the best evidence of their belief as to the applicability of Article 31 can be found in the statements made during the legislative hearing. I quote from the hearings before the House Committee on Armed Services, 81st Congress, First Session, on H. R. 2498, pages 984, 985:

"COMMENTARY: . . . Subdivision (b) broadens the comparable provision in A.W. 24 to protect not only persons who are accused of an offense but also those who are suspected of one.

. . . . . .

"MR. LARKIN: . . . In addition we have provided, as you see, that a person must be first informed in effect that anything he says can be used against him. That is not a requirement normally found in civil courts—this provision of informing a man in advance.

"MR. BROOKS: Isn't it a requirement in the Federal courts?

"MR. LARKIN: I don't believe so. It is not in most State courts. But here we do provide that you must inform him in advance and if you don't, then anything he says is inadmissible as far as he is concerned."

The previous quotations show a deliberate intent to build a separate ground of inadmissibility. Furthermore, the following statements argue persuasively that the framers of the Code did not intend to associate failure to warn with coercion. If they intended to merge both concepts into one, then these statements concealed that intent. In discussing the application of the Article to the military and to the civilians, the following discussion took place (pages 991, 992):

"MR. LARKIN: I think there ought to be a distinction pointed out there, Mr. Chairman. In many State jurisdictions the local authorities have no obligation to inform a person suspected of an offense that any answers they make may be used against them.

"I don't think if a confession is obtained by the civilian authorities that it should be inadmissible because the civilian authorities neglected to inform the man in advance of his rights.

"I do say this: If the civilian authorities extracted the confession from the man by any force, coercion or in any way that would make it an involuntary statement, then I think certainly it should not be admissible in evidence against him in a military trial.

"But you would face this situation if you required the civilians—whom you can't require by this code—to inform a suspect in advance as provided in subsection (b): A man may voluntarily walk into the local civilian authorities or a police station and make a confession and they won't know what it is all about and not having any obligation to inform him or not seeing any reason to, why you would

then not be able under the construction presented here to use such a statement or such a confession against the man. I think that would be—"

If the framers of the Code and the members of Congress who participated in the hearings did not intend to mark out a field of inadmissibility based on failure to warn, not associated with coercion or inducement, then they discussed the subject at great lengths for nought. If involuntary confessions obtained by civilians could be excluded from evidence and if those obtained without warning are involuntary, then all are excluded. Had coercion through authority been the only vice they were trying to regulate, there was no need of separately discussing the effect of failure to warn by civilians. Of course, it can be said that Congress was aware that in the military a superior officer or noncommissioned officer, merely by virtue of his office, exercises influence over a serviceman and, therefore, compulsion is always present. Compulsion always being present, a warning was necessary to neutralize that coercive factor. If that is the touchstone to be used then I suppose a sergeant need not warn an officer before taking a statement and a private need not warn a sergeant.

I have presented the foregoing arguments to point out the expressed intention of those who drafted the Code and the members of Congress who adopted it. However, that only becomes important if, in this setting, the Article must be interpreted because it is ambiguous and uncertain. To me it is crystal clear that failure to warn stands on its own bottom unsupported by involuntariness, and at the risk of being charged with over-simplification, I point out why. Subsection (b) provides:

"No person subject to this code shall interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

The subject of that subsection is failure to warn and that alone. There is no hint that coercion is hidden in the background. That subject is covered in other subsections. Subsection (d) provides:

"No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial."

That provision is in the alternative and that suggests it is severable into two parts, namely, (1) a statement obtained in violation of this Article (subsection (b), failure to warn), and (2) a statement obtained by the use of coercion, unlawful influence, or unlawful inducement. Not only does the Article identify separately the two requirements, but failure to warn can be applied with no difficulty in this case. Assuming the undercover man was an agent working for the Criminal Investigation Division, the provisions of the subsections are fitted to the facts in the following manner: (1) an informal investigation was being conducted, (2) the interrogator was subject to the Code, (3) he requested a statement from the accused who was suspected of an offense, (4) he failed to warn him, and (5) the statement is inadmissible under subsection (d).

Laying aside the language by Congress, I think it of importance to this decision to explore the purpose it had in mind when it broadened the scope of Article of War 24. That purpose was to protect an accused from being importuned to confess his part in a crime without full knowledge that he need not do so. I fail to see how that purpose can be furthered by permitting an interrogator to conceal his identity and then obtain the evidence. Interrogation is not changed because the interrogator wears denim and not khaki. It is unthinkable to believe that Congress in-

tended to permit members of the Armed Forces to control the admissibility of evidence by the simple expedient of putting on the robes of an informer. The Court so holds; but I believe in so doing, my associates must conclude that Congress intended to place clandestine operations on a higher plane than those conducted aboveboard. Moreover, embodied in their principle is a conclusion that Congress intended to grant to an accused a right, which by a change in uniform, can be rendered worthless. Those conclusions are contrary to my belief that Congress intended to protect the accused—not the informer.

The instant case announces principles poles apart from the concepts announced by us in previously decided cases. If those concepts were not spelled out clearly, or had we overextended the rule, there might be reasons to clarify or retreat. But I find neither present in this case. We forcibly condemned the interrogations of unwarned persons suspected of an offense by all persons subject to the Code, regardless of any pressure applied, in those cases. Moreover, we left no uncertainty about the rule that failure to warn alone was sufficient to bar a statement. I quote some statements from opinions written by my associates. In United States v. Wilson and Harvey, 2 USCMA 248, 8 CMR 48, they stated:

". . . We have no hesitancy in stating categorically that there is not a scintilla of evidence in the record to indicate that these admissions were not in fact voluntary.

"However, this does not dispose of the problem raised by their reception in evidence. Sergeant Wang did not preface his question with any sort of warning of the rights secured by Article of War 24, supra. Was it, therefore, error to receive the admissions in evidence, and, if so, does that error require reversal?

. . . . .

"We turn now to the problem of whether the erroneous admission of these statements requires that these convictions be reversed, entertaining no doubt that an affirmative answer is required. Where—as here—an ele-

ment of officiality attended the questioning which produced the admissions, there is more than a violation of the naked rule of Article 31(b), supra; there is an abridgment of the policy underlying the Article which must—we think—be regarded as 'so overwhelmingly important in the scheme of military justice as to elevate it to the level of a "creative and indwelling principle".' United States v. Lee (No. 200), 2 CMR 118. To put the matter otherwise, we must and do regard a departure from the clear mandate of the Article as generally and inherently prejudicial. United States v. Berry (No. 69), 2 CMR 114, decided March 18, 1952."

There is considerable doubt now about the blending of failure to warn and involuntariness, but there was not when we published United States v. Williams, 2 USCMA 430, 9 CMR 60. The Court in that opinion stated:

"We should perhaps make it quite clear that we are not deciding whether the confession in question is voluntary or involuntary. In every military confession, there must be two inquiries. First, was the accused properly warned, and second, was the confession obtained as a result of coercion, unlawful influence, or unlawful inducement? The confession must be excluded from evidence, according to the plain language of Article 31(d), if either of those proscriptions is violated:

'No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial.'

"The accused was not warned as required by Article 31—in point of fact, he was warned in explicit violation of the terms of that Article. Therefore, it was error to receive the resulting confession in evidence. Article 31(d), supra. We may note that we have previously held a violation of those warning requirements of the Code to be so important, policywise, as to cause invocation of the

**761**

doctrine of general prejudice, thereby rendering unnecessary an inquiry as to whether improper consideration of the confession was specifically prejudicial to. the accused's substantial rights."

I can hardly find in those quotations justification for holding that Congress intended to impose two burdens on those who investigated openly and only one for those who work surreptitiously. On the contrary, those statements announced a rule which should leave no doubt in the mind of any reader that the majority of the Court believed that a failure to warn by anyone subject to the Code was such a flagrant error, that they would not scrutinize the record for prejudice. Now it only becomes scandalous if the interrogator is honest enough not to conceal his identity.

In United States v. Pedersen, 2 USCMA 263, 8 CMR 63, we refused to permit a statement given without prior warning to be used for impeachment purposes. We were not concerned with coercion, as the accused voluntarily testified. Moreover, we placed our stamp of approval on paragraph 153b (2) (c) of the Manual for Courts-Martial, United States, 1951, which isolates clearly failure to warn from coercion. We there said:

"This testimony indicates that the accused was not informed, as required by Article 31 of the Code, 50 USC § 602, that any statement made by him could be used against him in a subsequent court-martial trial. The statements were obtained in violation of Article 31. Therefore, their use for impeachment purposes was improper and constitutes prejudicial error. Article 31, supra; paragraph 153b (2) (c), Manual, supra; United States v. Welch (No. 196), 3 CMR 136, decided May 27, 1952; United States v. Wilson and Harvey (No. 647), 8 CMR 48, decided February 27, 1953."

We can, of course, say we should retreat from those principles and throw a cloak of protection around a hired informer. I pause to wonder why. The Court in substance answers by saying: (1) the Government should be permitted to use informers; (2) if they are required to warn, they cannot conceal their purpose; and, if they must warn and do not, they can be prosecuted. My replies to those answers are these: First, the Government can use informers if they do not seek to avoid the law. Second, they need not disclose their purpose unless they seek by interrogation to obtain an incriminatory statement. Third, if an investigator who works in the open can be prosecuted for obtaining a statement from an accused without a warning, which I doubt, then both he and an agent who commit the same offense should not escape because they work undercover. Whether a person subject to the Code can be prosecuted for not complying strictly with the requirements of Article 31 is foreign in this case, but if anyone subject to the Code can participate in an investigation, and regardless of regalia, obtain a statement without warning, then the right my associates have so valiantly defended has been rendered worthless.

Federal civilian courts are not confronted with failure to warn, but there is a provision which can be analogized to Article 31. The provision I have in mind is the one found in 47 USC § 605, and it is commonly referred to as the "Wire-tapping Act." The Federal courts have uniformly held that evidence obtained by Federal officers in violation of that section is not admissible in evidence. Article 31 is comparable with those holdings as it provides that statements obtained without warning are inadmissible. Would anyone seriously contend that the provisions of the United States Code could be circumvented by agents of the Federal Government employing undercover men to tap wires for them? Moreover, is it rational to contend that when Congress placed that limitation on the admissibility of evidence, it intended to deny to the Government the right to use undercover agents? All I can gather from the Act is that it may circumscribe their activity, and I know of no good reason to support a holding that they should not be limited. They should operate in their sphere within the law, and members of the armed

services should be governed by the same principle.

Now as to my reasons for concurring in the result.

I would affirm the conviction on the basis of the test laid down by me in my dissent in United States v. Wilson and Harvey, supra. In that case I stated:

". . . Accordingly, I believe before the advice required by the Article need be given, three conditions should be fulfilled: first, the party asking the question should occupy some official position in connection with law enforcement or crime detection; second, that the inquiry be in furtherance of some official investigation; and third, the facts be developed far enough that the party conducting the investigation has reasonable grounds to suspect the person interrogated has committed an offense."

Collectively, all three conditions suggest that the interrogation be surrounded with an air of some officiality and I believe the Manual for Courts-Martial, United States, 1951, ante, and the hearings before the Committees of Congress support that proposition (see Comments, pages 990–991, Hearings Before the House Committee on Armed Services, 81st Congress, 1st Session, on H. R. 2498, Uniform Code of Military Justice). Moreover, a reading of the Article is convincing that Congress could not have intended Article 31(b) to cover casual conversations, because the language used compels the conclusion that the interrogator is pursuing some official inquiry as he must know that the person to whom he is talking is suspected of a crime; he must inform him of the nature of the accusation; and he must explain to him that what he says may be used against him in a court-martial.

Under any interpretation of the facts in this case, the interrogator, if he can be classified as such, could hardly be considered as operating under a mantle of officiality. I have not overlooked the contention that under one view of the evidence, Ferguson became an agent of the Criminal Investigation Division because he carried tales, therefore, he was brought within the spirit and intent of Article 31(b). Of course, if that theory of agency is sound, then every person, civilian or military, even though a volunteer, who assists a service agency in gathering facts, becomes an agent of the service if he seeks to obtain any information vocally. Under that hypothesis the burden is cast upon him to make certain Article 31 of the Code is explained prior to a question, or the evidence obtained is inadmissible. That coverage is so complete that a civilian police officer who has been requested to assist in apprehending a deserter would become an agent who would be subject to the Code and who could not elicit a suspectee's name, address, or any other admissible information concerning him unless he had previously recited Article 31(b). In most instances he would be entirely ignorant of its contents and totally unequipped to explain its provisions. The legislative hearing supports my contention in that regard.

This particular case is a concrete illustration of the inapplicability of the civil doctrine of agency when it is used as a basis for determining the officiality of an investigation. The argument in support of applying the doctrine goes: the Criminal Investigation Division was investigating; Ferguson was an agent; therefore, he was conducting an investigation. If so, he was unaware of his status and so was accused; and what he was investigating is a matter of pure speculation. While the record lacks some in clarity, it shows the conversation occurred on the 12th or 13th of February 1952, and at that time the accused was awaiting trial on a charge of leaving his post as a sentry. That offense is not involved in this case. He was not charged with these particular offenses until some fifty days later. From this, it seems reasonably apparent to me that any question framed by Ferguson to obtain information as to why the accused was in confinement, if pointed toward any crime, could only have referred to the one known offense and not to others which were the basis

for later prosecution. It may be that under different circumstances one working for an official investigator might be so controlled and directed that the doctrine of agency could be applied rationally. But merely because Ferguson was a handy conduit through which information could be obtained does not create a principal and agent relationship.

My concern in this case has little to do with undercover agents, but I am disturbed over laying down a rule of law which will close up many perfectly legitimate sources of crime detection. I do not believe that necessary, as it is proper to construe the language of a statute in a narrow and restricted sense, if, by doing otherwise, absurd and impossible results would be obtained. It is a fair assumption that Congress did not intend to saddle criminal investigations with insurmountable obstacles and a literal interpretation of Article 31 would bring about that effect. The framers of the Manual appreciated the difficulties to be encountered, and Article 31(b) was interpreted to apply only in the event the interrogation or questioning occurred in an informal or formal investigation. Maybe an inquisitive busybody or a prison decoy carries on an investigation when he asks a few casual questions, but not under my interpretation of the proceedings nor under my views of what I designate as occupancy of an official position.

A second ground to support my contention that a warning was not required is present in this instance. In this connection I am applying well known rules of civilian law and I am clothing the law officer in the military with the powers which befit his assignment. I have not found one good reason for not granting him the authority he needs to control properly the trial of a law suit, yet it appears to me that my associates seem unwilling to embrace the concepts which will accomplish that purpose. Wigmore, Evidence, 3d ed, § 2550, provides:

"The admissibility of a given piece of evidence is for the judge to determine. This general principle is not disputed; its application to the various kinds of evidence—qualifications of witnesses, absence of a hearsay deponent, voluntariness of a confession, condition of a dying declarant, and so on—has already been considered under the various heads of evidence. It follows that, so far as the admissibility in law depends on some incidental question of fact—the absence of a deponent from the jurisdiction, the use of threats to obtain a confession, the sanity of a witness, and the like—this also is for the judge to determine, before he admits the evidence to the jury.

"This principle, one of the foundation-stones of our law, has countless applications under the various rules of admissibility.

"In more recent times, however, a heterodox practice has appeared, in places, of leaving some questions of admissibility to the jury. No doubt the judge, after admitting evidence, leaves to the jury to give it what weight they think fit, for they are the triers of the credibility and persuasive sufficiency of all evidence which is admitted for their consideration (*post*, § 2551). But to hand the evidence to them, to be rejected or accepted according to some legal definition, and not according to its intrinsic value to their minds, is to commit a grave blunder. It is an error of policy (as well as a deviation from orthodox principle) for several reasons; in the first place, it is a needless abdication of the judicial function —of which humility we have already too much; furthermore, it adds another to the exceptions to the general rules; and finally, it cumbers the jury with legal definitions and offers an additional opportunity for quibbling over the tenor of the instructions.

"In the appurtenant corollaries of this function of the judge, it may be noted that he may of course *hear evidence on both sides* for determining the facts on which the rule of admissibility turns; that during this process the *jury may be retired* out of hearing; and that the judge's determination of this question ought

to be *final*, beyond review by appeal, and is so by the wholesome rule of a few Courts."

I hope to see that general principle developed as a concept in military law and I would apply it in this case. If that were done, an affirmance would be required and a good rule of law would be announced. So far as I can ascertain, it would improve the administration of military justice to divorce the court members from ruling on questions of law. One of the first steps to accomplish that would be to permit the law officer, in all instances not prohibited by the Code and the Manual, to rule on questions of law, and certain mixed questions of law and fact, when the latter are necessary to a proper determination of the former. Under that method of procedure, after the evidence had been admitted by the law officer, the members of a court-martial would determine its weight as it affects guilt or innocence but they would not be concerned with the facts as they bear on admissibility. Concededly, that general rule cannot be used in every instance as the Uniform Code of Military Justice and the Manual for Courts-Martial, United States, 1951, require a limited number of exceptions, but others should not be grafted on by this Court.

Some difficulty is encountered in applying the foregoing principle to all the matters covered in Article 31 and this may be occasioned by the fact that, at first blush, the Manual seems to discuss indiscriminately statements whose admissibility depend upon either voluntariness or failure to warn. We, however, should be competent to distinguish them clearly and rule accordingly. In some instances the two grounds may blend together while in other instances, there is no reasonable relationship. In the latter instance, where inadmissibility depends upon failure to warn, the ruling of the law officer should be final, and the ultimate triers of fact should have no authority to redetermine that issue. In furtherance of that principle, I desire to point out that the last subsection of Article 31 contains two parts which are stated in disjunctive and I quote them: "No statement obtained from any person (1) in violation of this article, or (2) through the use of coercion, unlawful influence, or unlawful inducement, shall be received in evidence against him in a trial by court-martial." That section deals specifically with two separate and distinct areas which, if invaded, will render a statement inadmissible. The second area covers statements made under compulsion and the first covers those which are given without the required warning. The reason for excluding the latter arises out of its possible untrustworthiness, while the former is not predicated on that premise. Here we have a clearcut issue as this case furnishes a classic example of a suspectee making a statement when there is no compulsion exercised, but there is a failure to warn present. The two problems thus posed are: (1) Who makes the final determination on the admissibility of the statement when inadmissibility depends solely on failure to warn and (2) is there evidence to support the finding?

Article 51(*b*) provides as follows:

"The law officer of a general court-martial and the president of a special court-martial shall rule upon interlocutory questions, other than challenges, arising during the proceedings. Any such ruling made by the law officer of a general court-martial upon any interlocutory question other than a motion for a finding of not guilty, or the question of accused's sanity, shall be final and shall constitute the ruling of the court; but the law officer may change any such ruling at any time during the trial. Unless such ruling be final, if any member objects thereto, the court shall be cleared and closed and the question decided by a vote as provided in article 52, viva voce, beginning with the junior in rank."

Language could hardly express more clearly that the law officer's ruling on the admissibility of evidence is final and it makes no difference whether the admission is opposed for reasons of involuntariness or failure to warn. It is true that when the admission is opposed because of involuntariness, the

765

statement may be given some preferential consideration by the members of the court-martial, but this need not be extended to failure to warn. As to the former, this is what the Manual states:

"The ruling of the law officer (or of the special court-martial) that a particular confession or admission may be received in evidence is not conclusive of the voluntary nature of the confession or admission. Such a ruling merely places the confession or admission before the court, that is, *the ruling is final only on the question of admissibility*. Each member of the court, in his deliberation upon the findings of guilt or innocence, may come to his own conclusion as to the voluntary nature of the confession or admission and accept or reject it accordingly. He may also consider any evidence adduced as to the voluntary or involuntary nature of the confession or admission as affecting the weight to be given thereto." [Emphasis supplied.]

In this case it is conceded the confession was voluntary so we can banish ▆▆▆▆▆▆ any further discussion on that issue and proceed to the other. There is no similar Manual provision allowing each member of the court-martial to come to his own conclusion on failure to warn, and this brings into prominence the fundamental difference between the two. When a person has been compelled, coerced, or induced to make a statement he may fabricate the story. Certain individuals, to escape abuse or maltreatment, may concoct false versions of events or may confess to crimes they did not commit. The probabilities that they will, vary directly with the pressure applied, but in all instances when a person is not permitted to exercise a free choice, his statement may not be entirely trustworthy and the court should be permitted to consider any statement in light of that pattern of human behavior. That reason does not, however, apply when the interrogator merely fails to warn. The absence of warning, uninfluenced by other and separate coercive factors, has little relationship to trustworthiness, and, even though the triers of fact may believe

**766**

or disbelieve the statements for a myriad of reasons, the mere failure to warn can hardly be considered influential. Certainly, there is no burden placed on the law officer to permit the court-martial to accept or reject his ruling.

The previous statement presupposes a dispute as to whether a warning was given, but that was not in issue here. No one suggests a warning was given, but there were other factual matters which were encountered by the law officer and he had to resolve those disputes before he could rule on the admissibility of the statement. He was faced first with a determination of whether officiality was present. Any possible holding that it was could only be sustained by a finding that Ferguson was an agent used by the Criminal Investigation Division to interrogate the accused. There was a conflict in the testimony as to that status and the law officer ruled in favor of the Government's witnesses. If he chose to believe one witness and disbelieve another, he did not exceed his authority as he has the unqualified right to determine their credibility. A second question is: Did Ferguson interrogate or request any statement from the accused? Again there appears to be a dispute about that issue. The former stated that the accused had been confined in a stockade prior to his incarceration for this offense (he had served time on two occasions for absence without leave), and when he returned on this occasion, he, Ferguson, casually remarked, "What are you doing there [here] again?" and the accused then related the confession. The accused, on the other hand, testified that Ferguson hounded him for a period of days, and that the only information he disclosed was to the effect that he did not commit the offense. If the law officer believed Ferguson, then the statement was voluntary and there was no interrogation or inquiry in the accepted sense. On the other hand, if the accused's story was accepted as the true version, then Ferguson's conduct could have violated the Code.

I have presented two legal issues which affected the admissibility of the statement. The facts underlying those

■■■■■■■■

issues had to be determined by the law officer and his ruling on them is final. We can overturn his ruling only if there is not evidence to sustain it; in this instance, I find there is sufficient evidence to support his conclusion. I would, therefore, hold the law officer did not commit error in permitting the statement to be introduced in evidence.