UNITED STATES, Appellee

v.

LEONARD E. DANDANEAU, Staff Sergeant, U. S. Marine Corps, Appellant

5 USCMA 462, 18 CMR 86

No. 5156

Decided February 11, 1955

CDR Earl C. Collins, USN, for Appellant.
CDR Raymond W. Glasgow, USN, and CDR George P. Kurtz, USN, for Appellee.

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused's conviction for desertion with intent to shirk important service in violation of Article 85, Uniform Code of Military Justice, 50 USC § 679, and missing movement through design in violation of Article 87, 50 USC § 681, has been affirmed by intermediate appellate authorities. Two issues are raised on this appeal:

"1. Whether the first confession made by the accused to Captain Lucas was secured in violation of Article 31, and if so, whether the second confession was tainted by the illegality of the first.

"2. Whether the specifications of the two charges are multiplicitous, and if so, whether the accused was prejudiced thereby in regard to the sentence imposed."

The accused was in the aircraft maintenance section of a Marine Corps air unit operating aboard the carrier USS SAIPAN, then in port in Florida. At a muster on October 8, 1953, the section personnel, including the accused, were informed that the carrier and its air units were scheduled to leave on October 13. When the accused logged out for liberty later in the day, the Squadron Duty Officer also told him of the impending departure. It was common knowledge that the carrier's ultimate destination was the Far East.

The accused failed to return from liberty. His unauthorized absence as of 7:31 a.m., October 9, 1953, was duly noted in his service record. On the prescribed day, the SAIPAN departed. A second entry showing the accused as "missing movement" was made in his service record. At 10:25 a.m., October 24th, the accused surrendered himself at the Marine Corps Air Station, Miami, Florida.

Word of the accused's surrender reached Captain W. R. Lucas, the com-

manding officer of one of the squadrons at the station. Captain Lucas knew the accused personally for about one year. He had served successively as Electronics Officer and as Adjutant of the accused's organization, until shortly before the carrier's departure. Although orders were not officially issued, he anticipated that the accused would be assigned to his squadron.

About noon Captain Lucas saw the accused in the squadron office. Eight or nine other persons were present. He "walked up to him [the accused] and conversed with him on more or less a personal basis, asking him what happened." In the course of the conversasation, the accused made a number of incriminating statements. An hour later Captain Lucas again saw the accused. This meeting was in his own office during "official office hours with the Sergeant Major present." On the accused's entry, he explained to him Article 31 of the Uniform Code. He further informed him that he "would be under investigation probably for desertion and unauthorized absence." Then he questioned the accused about the circumstances of his absence. The accused's answers contained incriminating statements which were "basically" the same as those in the earlier conversation.

At the trial, the direct examination of Captain Lucas was limited to his second conversation with the accused. However, before he testified to the actual statements, defense counsel objected. Further questioning by both counsel and the law officer disclosed the fact, the circumstances, and the content, of the first conversation. Captain Lucas also testified that his initial talk with the accused was prompted solely by personal considerations, whereas the purpose of the second was entirely official. His description of the first conversation is as follows:

"... it was, as I told you, as though you were talking to an individual under normal conversation as if they were sitting in your home, two people conversing between each other."

Other than the matters brought out

by the cross-examination of Captain Lucas, the accused presented no evidence on the preliminary question of the admissibility of his pretrial statements. It is now contended that the adverse ruling on this objection was erroneous and prejudicial.

An incriminating statement obtained from an accused in violation of Article 31, Uniform Code of Military ■■■■■■■ ■ tary Justice, 50 USC § 602, cannot be admitted in evidence. Under certain circumstances, the influence of an improperly obtained statement may carry over and taint a subsequent statement which might otherwise be admissible. Leyra v. Denno, 347 US 556, 98 L ed 948, 74 S Ct 716; United States v. Monge, 1 USCMA 95, 2 CMR 1. The evidence here shows scrupulous adherence to the requirements of Article 31 at the second meeting between Captain Lucas and the accused. Standing alone, the incriminating statements made at that time are plainly admissible. Are they, however, the result of, or so closely connected with, information illegally obtained from the accused as to require their exclusion? The answer to that question depends in part on the admissibility of the accused's declarations in the first conversation. If they could be received in evidence, they obviously could not have improperly influenced the later statements.

Not every inculpatory statement made by an accused in conversation with another is inadmissible because of a failure to warn him of his rights under Article 31. The prohibition of the Article extends only to statements elicited in the course of official interrogation. United States v. Gibson, 3 USCMA 746, 14 CMR 164. It is essential, therefore, to determine whether the question asked by Captain Lucas, when he first met the accused in the squadron office, is, as a matter of law, so clearly official or so demanding of an answer by virtue of his superior rank as to fall within the interdiction of the Uniform Code.

Although Captain Lucas was not questioned specifically on the point, it is clearly inferable from his testimony that his initial meeting with the ac-

cused was by chance. True, he anticipated the accused's assignment to his company, but he had no official information on the subject when he approached and talked to the accused. He was no stranger to the accused. On the contrary, he and the accused had known each other for about a year, and they had worked in the same organization, until the captain was transferred a few weeks before the accused absented himself. Moreover, Captain Lucas' own motivation was entirely personal. The record is silent as to the light in which the accused regarded the conversation. It is also silent as to whether he knew that Captain Lucas was the commanding officer of the unit to which he was to be assigned. However, from the informality of the conversation and the place it occurred, it may be inferred that he too regarded the encounter as a casual meeting.

One may occupy a position officially superior to that of an accused, without necessarily characterizing all his actions in relation to the accused, as official. In United States v. Volante, 4 USCMA 689, 16 CMR 263, for example, a post exchange steward was held to have acted as a private person in conducting a search of the accused's personal effects, even though, at the time, the accused was officially assigned to the same store as a subordinate. Considering all the circumstances, therefore, there is substantial evidence from which it may fairly be concluded that the first conversation between Captain Lucas and the accused was not official and that the situation was not one in which superior rank exerted "pressures" depriving the accused of "his freedom to answer or remain silent." United States v. Gibson, supra, page 752. It follows that the · disclosures then made by the accused could be admitted in evidence, without the necessity of showing preliminary warning under Article 31. Being themselves admissible, they could not, in any way improperly taint the statements made in the second conversation. Hence, there

is no error in the admission of the accused's incriminating declarations.

Turning to the question of multiplicity of charges, we need not make lengthy answer to the ▮ claim of error. Suffice it to note that even assuming multiplicity, a finding of guilt can properly be returned on each of the multiplicitous charges. Multiplicity affects only the sentence. United States v. McCormick, 3 USCMA 361, 12 CMR 117. Here the major offense of desertion is punishable by a dishonorable discharge, total forfeiture and confinement for a period of five years, while the confinement period for the offense of missing movement could not, at the time, exceed six months. The court imposed a sentence which included a bad-conduct discharge, partial forfeiture, and confinement for eighteen months. In the post-trial review, the Wing Legal Officer specifically called attention to the question of multiplicity, and, because of it, recommended reduction in the sentence. On the basis of that recommendation, the reviewing authority reduced the period of confinement by six months. This action patently removed the effect of any possible prejudice resulting from multiplicity. United States v. Crusoe, 3 USCMA 793, 14 CMR 211.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

BROSMAN, Judge (dissenting):
This hard case must not be permitted to make bad law—and I cannot agree with my brothers in their disposition of it.

II

I must enforce here the policy I find to be expressed clearly in Article 31 of the Code—and in doing ▮ this, I am required to vote to reverse the board of review. In my book, this is neither a Monge, a Gibson, nor a Volante case,[1] and I, for one, would not have been willing to approve the admission in evidence of the contents of the Captain's

[1] United States v. Monge, 1 USCMA 95, 2 CMR 1; United States v. Gibson, 3 USCMA 746, 14 CMR 164; United States v. Volante, 4 USCMA 689, 16 CMR 263.

first interview with the accused—assuming there had been no other. The record reveals that the law officer at the trial felt exactly as I do in the matter.

Of course, I agree that not every conversation between military personnel—even between a military superior and a subordinate—must be deemed "official." At the same time, I am sure that (1) when the subject matter of the interview has to do with misconduct on the part of the latter, and (2) where the interviewer stands in the position occupied by Captain Lucas here, much more is demanded to purge the situation of its odor of officiality than I am able to find in this case.

### III

Addressing myself to the "fruit of the poisonous tree" aspect of the problem, I entertain no doubt that, in the setting in which it confronts us here, the mere reading of Article 31 to the accused by the Captain at the opening of the second—and concededly official—interview cannot with safety be said to have interrupted a dangerously possible chain of causation. See United States v. DeLeo, 5 USCMA 148, 17 CMR 148, n 4. Against some backgrounds I might well be willing to take another view—but not here.

Naturally, I do not believe that a precedent conversation—like the first one in this case—is inescapably fatal to any court-martial use of a subsequent warned confession. I merely say that in this situation—as well as in that discussed earlier in this memorandum—a greater burden of purgation is laid on law enforcement authorities than I find to have been sustained here. I do not at all hesitate to reach this conclusion—this for the reason that it would have been quite easy in the present case for Captain Lucas to avoid the stain of his earlier interview.

I recognize, of course, that the second conversation took place under conditions of comparative formality, and also that the accused held the grade of staff sergeant—which doubtless reflects that he did not enter the Corps yesterday. These are the only circumstances I can possibly find to balance—together with a naked reading of Article 31—against a "poisonous tree" result. See United States v. DeLeo, supra. To me these items simply do not weigh enough.

Indeed, I would suppose that a certain amount of ritual ever attends the administration of the warning demanded by the Code. And what if the accused had been a mere private, and if his probable service ran to one year instead of, perhaps, to a longer period. Unless, therefore, we are willing to hold that a reading of the Article in question—without more—shall be taken to break the chain, then it must bind us here. And I am unable to join in such a holding.

### IV

In my view a rehearing is demanded.

UNITED STATES, Appellee