(No. 22686.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY SYLVESTER CAMPBELL, Plaintiff in Error.

*Opinion filed February 15, 1935.*

BURGESS & O'NEAL, and VIRGIL W. MILLS, for plaintiff in error.

OTTO KERNER, Attorney General, CHARLES W. CREIGHTON, State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

On the night of July 14, 1932, a group of bandits entered the farm home of Fremont Pearce, in Wayne county, Illinois, and tortured him for the purpose of forcing him to disclose the hiding place of supposed valuables in his possession. The details are revolting and of no importance to the decision of this case, it being sufficient to say that his injuries were such that he died, as it is claimed, as a result of them about two weeks later. For this crime the plaintiff in error and Charles Roy, Edward Lawler, Raymond Mallicott and Jack Moore were indicted charged with the murder of Pearce. Plaintiff in error was granted a separate trial. Mallicott and Roy were tried and convicted in October of 1932, and the other two defendants were never apprehended. The case against plaintiff in error was continued on seven different occasions until October of 1932, at which time he was tried, convicted of murder, and his punishment fixed at fourteen years in the penitentiary. A reversal of that judgment of conviction is sought by this writ of error, motions for a new trial and in arrest of judgment having been overruled.

Upon trial of the case eighteen witnesses testified for the People and the same number for the defendant, but it is unnecessary to review all of this evidence, because most of the facts are uncontroverted which were proved by these witnesses. The defendant did not question that Pearce had

been tortured and robbed, nor did he seriously argue that he did not die as a result of the wounds he then received, although the evidence on this point is not entirely satisfactory. On the other hand, the People did not contend that the defendant was one of those present at the time of the torturing of Pearce, it being the theory of the People, upon which he was convicted, that he had previously given to the bandits a description of the Pearce home and how to reach it, by making a map or diagram for them in a certain boot-leg place which will be mentioned later in this opinion, for which, the People claimed, he was to receive ten per cent of the proceeds of the criminal venture. For this essential proof the People depend entirely upon the testimony of Dr. D. A. Hilliard, one of the physicians who cared for the deceased and who appears to have interested himself in the investigation, and the testimony of Elmer A. DeShields, a colored man twenty-four years old, who was the operator of a beer flat in Madison, Illinois, which was owned by himself, George Karras and Raymond Mallicott, one of the other defendants under this indictment.

The principal contentions of the plaintiff in error are that the testimony of Dr. Hilliard was entirely inadmissible, and that the testimony of DeShields was so fully impeached and so unreliable as to leave no competent evidence in the case to sustain the conviction. A review of part of the evidence is necessary for the determination of these points.

Dr. Hilliard testified that he was a deputy sheriff at the time to which his testimony referred and also at the time of testifying; that he was in a room in the court house in Wayne county with sheriff Marion Ellis; Ernest Burckett, a deputy sheriff; Deneen Matthews, State's attorney of Wayne county; J. B. Schrader, a detective from an adjoining county; three highway police officers, and William Miskell, a deputy sheriff from St. Clair county, the sheriff having called him in; that Campbell, the plaintiff in error, was there and asked the witness if he (Campbell) had not

always been a straight and honest man, and for the witness to tell those fellows whether or not he thought him to be that. The doctor testified that he told them that he did think Campbell was a straight and honest man, and that he then asked Campbell if he told those fellows over in jail the location of Pearce's house from the Bradford school house south and from Cisne north; that no one had told him that Campbell had directed the bandits to Pearce's house but that it just occurred to the witness that he might have done so, and that was his reason for asking him the question. The witness gave no direct quotation of Campbell's alleged language, but said in his own indirect language, "and he told me how he located Pearce's house from the Bradford school house south and Cisne north; also he gave them the name of Fremont Pearce, Jake Barth, Wes Smith and Earl Keith, and that he was to get ten per cent of the money they got."

Upon a preliminary hearing by the court, out of the presence of the jury, to determine the admissibility of the Hilliard statement, the court heard also a number of other witnesses. The State's attorney, Deneen Matthews, testified that he did not make any promises to Campbell to induce him to make his statement and that there were no threats. He did not corroborate the testimony of Hilliard in any essential particular.

George Keulks testified that he did not make any promises, but that he heard either the sheriff or the State's attorney say that if Campbell would tell the truth they would see to it that he got out on bond. Sheriff Ellis testified there were no threats, but that "we offered to try to see that he'd fill bond if he could." He testified that Hilliard was there some time during the interview but did not testify to any statement claimed to have been made by Campbell. On cross-examination, and on examination by the court, he stated that someone there promised Campbell that if he would "come clean" they would make it as lenient

for him as possible. He testified that it was some officer of the law from that or an adjoining county, but he could not remember who.

J. B. Schrader, a detective, testified that he was present; that the door was locked, and that the sheriff unlocked it to let Dr. Hilliard come in; that Campbell was present, and that he made promises to Campbell. He testified that the State's attorney had told him that anything he promised he would back up, and that he made promises; that he told Campbell that if he would help clean up the case they would help him; that the sheriff told him that they did not think but that he could get out on a bench parole, and that they all made promises to Campbell finally; that the State's attorney promised that it would go very easy with him, and that his bond would be cut down so he could get right out of jail if he would talk. The State's attorney was re-called and denied that he had given Schrader the authority which Schrader claimed, but admitted that "I did leave most of the questioning to Mr. Schrader." On cross-examination he admitted there had been some discussion as to promises of leniency—about whether it would be harder on him or easier on him—but insisted that no promise was made while he was there, and said that he could not make any promises because he was not going to be State's attorney at the time the case would be due for trial.

Henry Wegener testified that he was a State highway police officer and was present at the time in question; that Campbell was promised that he would be permitted to give bond if he could give a bond that the court would approve.

William Miskell, a deputy sheriff of St. Clair county, testified that he was present, and in his own words said: "I told Campbell if he would help us out in this case and help us get the rest of the men that we would go along and get him a bench parole, or he would never be tried. That was promised by the State's attorney. * * * I promised

him myself that if he would make a statement they would try to get him a bench parole. I made that promise in the sheriff's office in the presence of the sheriff and the State's attorney. I suppose the State's attorney heard me make it. I made it loud enough that he could hear. I made that promise before Campbell talked. I made that promise to all of them—to anyone who would talk. We brought them one at a time. We told them all that. Mallicott and Roy did not have anything to say. We only made a deal with Campbell—just the kind of a deal I told you. The State's attorney told Mr. Schrader any deal he would make he would back up. I told Campbell that."

Ernest Burckett testified that he was a deputy sheriff and was present at the conversation in question, and that the only thing he heard was that they would see to it that the accused got out on bond.

It is significant that all of the witnesses agreed that some sort of promise or inducement had been made, and it is even more significant that of all the eight or ten persons present at this interview none but Dr. Hilliard testified to any confession or admission of any kind on the part of Campbell. This omission of evidence adds further to the improbability that Campbell would call Dr. Hilliard into the room to certify to his honesty, and in the next breath, without apparent reason, make so damaging an admission as that attributed to him, and that the doctor had not been told by anybody to ask that question but that it had just occurred to him that Campbell might have directed the bandits. No further discussion of the testimony of Dr. Hilliard is necessary in the view which we take of the record.

It is an established rule that a confession obtained by promise or hope of reward is not admissible in evidence. (*People* v. *Heide*, 302 Ill. 624; *Robinson* v. *People*, 159 id. 115; *Bram* v. *United States*, 168 U. S. 570.) If a

confession is secured by hope of leniency the law presumes that it was induced by such promises. (*People* v. *Buckminster,* 274 Ill. 435.) In such cases the law can not measure the force of the influence used nor decide upon the effect such promises may have had upon the mind of the prisoner. (*People* v. *Swift,* 319 Ill. 359; *People* v. *Bogolowski,* 326 id. 253.) The burden is upon the People to show that a confession was voluntarily made. (*People* v. *Sweetin,* 325 Ill. 245.) In reply to the argument of the plaintiff in error the People do not even contend in their brief and argument that the promises and inducements were not made as testified to by the various officers.

The argument for the People is that the statement in question was not a confession but a mere statement of Campbell to Dr. Hilliard. This argument is idle, because if the statement was not intended to be construed as a confession it was not material to the issues here. Unless it was intended to be an admission that Campbell told the bandits who tortured and robbed Pearce who Pearce was, where his house was, how it could be reached and what they could expect to find, and in return for this expected to get ten per cent of the proceeds, it is entirely irrelevant. It is true that a careful analysis of the statement fails to bring it up to the grade of a real confession because of its indefinite and uncertain nature. The point is that it was intended to be construed as a confession, and in ten paragraphs of the brief for the People it is so referred to, and twenty-four cases, as well as Corpus Juris and several text books, are cited upon such propositions as that "a confession is of the highest order of proof," and other similar statements of law. On the record now before us there can be no doubt that whatever the defendant may have said in the interview outlined was induced by hope of leniency, and probably by a promise that he was not to be prosecuted. Whatever he said at that interview was clearly inadmissi-

ble against him, and its admission by the trial court before the jury was prejudicial to his interests.

The colored witness, DeShields, to whom we have referred above, testified that he, together with George Karras and Raymond Mallicott, operated a beer flat in Madison, Illinois, and that the crime in question was plotted in his place of business while he was present. The pertinent part of his testimony as abstracted is as follows: "They were all sitting down, drinking, before Charles Roy came. After Roy came I went· to serve them some more beer. I noticed a map of some kind on the table. I just stood up about five minutes there watching it, and Campbell was pointing and showing different distances of houses and stuff from Flora, Illinois, to Mr. Pearce's—Fremont Pearce's— from the school house on, and something else I don't particularly remember. It was National Stock Yard paper— that was the heading of the paper. I have never seen that map since that date. Raymond had it the last I saw of it that evening. I do not know what became of it nor where it is now. * * * It had dimensions drawn out and had Mr. Fremont Pearce's name with a circle around it, and also a circle around a house and some school house and other houses along the road from Flora, Illinois, to Fremont Pearce's home. Pearce's home was the last on the map. I heard ˙some conversation between Campbell and these men. Well, I didn't hear it all. I just caught some of it. I heard Sylvester Campbell say, 'You boys know I used to live around there, and I couldn't go along with you because everybody in the community knows me and it would be ropes if I did.' This was approximately six days before July 13." The witness also testified that he saw Mallicott, Roy, Moore and Lawler (but not Campbell) when they started out on their expedition of robbery; that he and one Mitchell drove to Collinsville and took a sawed-off shot-gun out of the place at Madison and a quart of raw alcohol; that they drove Mallicott's car;

that while at Collinsville Moore and Lawler drove up; that when they drove up he took the sawed-off shot-gun and the quart of alcohol and put them in their Chevrolet sedan; that the four above named were in the car, and that he put the alcohol and shot-gun in the back seat.

The defendant offered evidence that during the entire months of June and July he was working in the cattle yards for a livestock commission house, and that he was not off at any time during the months of June and July; that his hours were from around 5:30 in the morning until 5:00 or 5:30 in the evening. Two witnesses testified that the work which he did was of such character that he could not leave it without others knowing it. There was evidence that he worked Sundays as well as other days. In proof of his good reputation for being a peaceable and law-abiding citizen he offered witnesses until stopped by the court with the remark that he need not offer any more, and there was no evidence to the contrary.

Three reputable and credible lawyers, one of them a former judge and one at the present time a State senator, testified that they were present in a law office in St. Louis when the witness DeShields made an affidavit stating that he knew nothing about any charge against Campbell, and that from his own knowledge and belief Campbell had no connection with or part in the transaction. This affidavit was introduced in evidence, as was also a letter from De-Shields directed to the defendant, inviting him to come to St. Louis to see him, in response to which letter the defendant, with one of his attorneys, went there. The court reporter who took the testimony in shorthand in the trial of the People against Mallicott and Roy under this same indictment was called, and by his testimony it was proved that at the former trial DeShields did not mention Campbell as being one of those present at the beer flat when the robbery was planned. In answer to the question, "Who was there?" his answer was, "Ray Mallicott, Charles Roy,

Jack Lawler, Eddie Moore and George Karras and myself." Besides this direct impeachment, two witnesses testified to their long acquaintance with DeShields and that his reputation for truth and veracity was bad.

Upon this record we find it unnecessary to comment at length as to the testimony of DeShields. Upon his own testimony he was an accessory before the fact, and his testimony, even if otherwise apparently fair and credible, would be received and acted upon with great caution. (*Hoyt* v. *People,* 140 Ill. 588; *People* v. *Alward,* 354 id. 357; *People* v. *Hudson,* 341 id. 187.) Disregarding the incompetent testimony of Dr. Hilliard and the impeached and unbelievable testimony of DeShields, there is no evidence of any kind in the record connecting the plaintiff in error with the crime charged.

The judgment will be reversed and the cause remanded to the circuit court of Wayne county.

*Reversed and remanded.*