

Decided October 3, 1952

COL. Kenneth B. Chase, USAF, and CAPT. Benton C. Tolley, Jr., USAF, for Appellant.

COL. Wendell C. Dreier, USAF, and CAPT. William E. Shannon, USAF, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Colbert, was tried by general court-martial at Reese Air Force Base, Texas, on May 9, 1951, under specifications alleging the following offenses: larceny of a portable typewriter valued at about $60.00, in violation of Article of War 93, 10 USC § 1565; two instances of absence without leave, in violation of Article of War 61, 10 USC § 1533; and the making and uttering of six checks upon a nonexistent bank account during the period of January 25, 26, and 27, 1951, in violation of Article of War 96, 10 USC § 1568.

The court found petitioner guilty of all charges and specifications, and sentenced him to dishonorable discharge, total forfeitures, and confinement at

4

hard labor for two years and six months. Apart from reducing the period of confinement to one year, the convening authority did not disturb the sentence. A board of review in the office of The Judge Advocate General, one member dissenting, affirmed. This Court granted accused's petition for review on March 14, 1952. Only Charges I and III, relating to larceny and the making and uttering of worthless checks, are in issue here.

## II

With respect to the larceny charge, petitioner contends that an extrajudicial confession admitted against him was involuntary, and should have been excluded. We stated some of the principles regarding such issue in United States v. Monge (No. 9), 1 USCMA 95, 2 CMR 1, decided January 8, 1952:

". . . The issue of voluntariness, as presented to the trial court, is usually one of fact. *Basically, the question is whether the accused possessed, at the time of the confession, 'mental freedom' to confess or deny participation in the crime.* Lyons v. Oklahoma, 322 US 596, 602, 88 L. ed. 1481, 64 S. Ct. 1208. To fulfill our appellate responsibility, it is incumbent upon us to review independently the circumstances surrounding the allegedly involuntary confession. But where there is disagreement as to whether claimed improper acts actually occurred or where admitted facts permit different inferences, the trial forum is not only better equipped but has the legal duty to weigh the evidence and decide whether the confession is, in fact, voluntary. We must accept the determination of the triers of fact on the question of voluntariness whenever it is supported by substantial evidence, regardless of whether we, as individuals, might resolve the conflict otherwise, or draw different inferences from the facts. If the fact finders could reasonably conclude that the confession was voluntary, then we must affirm."

See also United States v. Sapp (No. 14), 1 USCMA 100, 2 CMR 6, decided January 8, 1952.

We turn now to the circumstances attendant upon the confession of petitioner. He was first questioned about the typewriter theft on October 26, 1950. Initially he denied any connection with it. He was questioned on several later occasions, but the record is unclear as to the specific dates on which these subsequent interrogations took place. Nor is the record entirely certain as to the date on which the confession here in dispute was obtained. It does seem, however, that it was signed on December 18, 1950, but was not sworn to by petitioner until January 11, 1951. These delays appear to have been caused by intermittent absences without leave on the part of petitioner.

The critical circumstances bearing on the admissibility of this confession are, of course, those immediately surrounding its procurement, for they alone bear directly on its voluntary nature. There is some confusion in the record on this point, but we understand it to show that at the time the confession was made, on December 18, 1950, or some preceding day, petitioner was being questioned by only one man, a Sergeant De Oca. At that time petitioner had not been placed under oath, but had been advised of his rights under Article of War 24, 10 USC § 1495—that he need make no statement and that anything he did say might be used in evidence against him. Parenthetically it may be said that on the stand the accused testified he understood these rights throughout the period he was being interrogated. Sergeant De Oca told petitioner that a woman employee at the pawnshop where the typewriter had been found could identify him as the man who had pawned it, that his fingerprints were on the typewriter, and that it could be proved by handwriting analysis he had signed the pawn ticket. What happened thereafter is the subject of some confusion. Petitioner testified that the sergeant then said it would be "easier" on him if he confessed, although in the next breath he stated the sergeant had not promised him any reward or benefit of a substantial nature if he confessed. He testified further that the sergeant went

on to tell him that if he was convicted of the theft he could thereafter be prosecuted for perjury for having denied it and might be sentenced to an additional five years' imprisonment. This, says petitioner, "scared" him into confessing.

The sergeant, in his testimony, did not recall having said to petitioner that things would be "easier" for him if he confessed. He was somewhat less definite with respect to having said anything about perjury, conceding he might have "implied" to petitioner that denying the theft if he had committed it would be perjury.

It is important here to proceed to the events surrounding petitioner's swearing to his confession on January 11, 1951. At that time he was placed under oath and advised of his rights under Article of War 24, supra. The lieutenant who was to receive the statement under oath testified he was not required to make a sworn statement, but that if he did so it should be true and accurate. The lieutenant related he then read to petitioner the definition of perjury contained in the Manual for Courts-Martial, and explained that a knowingly false statement under oath would constitute perjury. He denied making any threat to petitioner. We advert to this occasion to clear the air of circumstances surrounding the confession in question, for it is apparent in the record that the witnesses tended to group the events of January 11, 1951, when the confession was sworn to, with those immediately attendant upon its initial procurement. This distinction is important, for actually the events of January 11, 1951, play no part in determining the voluntariness of the confession, which had then been extant almost a full month. It is only the events related above and immediately surrounding the taking of the confession which are of probative value in determining its voluntariness.

Reverting now to those events, we note, first, a conflict in testimony. We might dispose of the issue of voluntariness by an observation that the facts are in dispute and that we cannot conscientiously say there is insufficient evidence in the record to sustain the conclusion of the members of the court-martial that the confession was freely given. However, we choose to rest our determination on a different ground with the thought that thereby we may make a more significant contribution to the body of military decisional law.

Accepting petitioner's version of the events immediately attendant upon the taking of his confession, we are of the firm conviction it was properly received in evidence—and we so hold. He does not attempt to demonstrate that the asserted representation of the sergeant questioning him that it would be "easier" on him if he confessed would vitiate the confession. Understandably so, for petitioner made it clear in his own testimony he did not regard the sergeant's statement as meaning very much. Petitioner does contend seriously, however, that his confession was involuntary because of the alleged "threat" he could be prosecuted for perjury and sentenced to five additional years in the penitentiary if he persisted in denying any part in the theft but was subsequently convicted for it. We cannot agree with his conclusion.

We note, first, that in this record there is no evidence of interminable periods of questioning, no evidence of physical abuse, and no evidence of more subtle exertions of compulsion. There is, in short, nothing even smacking of "the third degree." A mere admonition to tell the truth could hardly vitiate a confession it might produce. Sparf and Hansen v. United States, 156 US 51, 54–56, 39 L ed 343, 15 S Ct 273. However, the statement made to petitioner respecting perjury and its consequences was something more than a simple admonition. It was more nearly in the nature of a threat, yet was not a *threat* in the ordinary sense. However, the present problem does not demand that we define precisely the nature of the statement made to petitioner, but rather requires that we appraise its effect. Was the nature of the statement such that there is any reasonable likelihood that it would so constrict the will of petitioner that he might have been induced to confess

**6**

guilt of a serious crime which he did not commit? We think not. The record contains substantial evidence from which the law member and the court-martial might conclude, as they did, that the reference to perjury by the investigator was not an action of sufficient persuasion to extract an involuntary confession of questionable veracity. Nor do we think that a conviction based on that confession violates military due process. We see nothing whatever in the circumstances surrounding its procurement to suggest "fundamental unfairness." Lisenba v. California, 314 US 219, 236, 86 L ed 166, 62 S Ct 280.

It must be understood that "voluntary" as used in law with respect to a confession is in no way ▇ synonymous with "spontaneous." The term does not at all connote that a confession, to be admissible, may not have been extracted from the defendant by searching examination and the use of prodding questions. Rather it means that the confession must be the product of free choice—of a will not encumbered or burdened by threats, promises, inducements, or physical or mental abuse. Moreover, the threats, promises, or inducements which may be held to have produced an involuntary confession must be of such a serious or substantial nature that they could possibly have operated to impair the defendant's freedom of will. There is no doubt in our minds that the confession involved here was the product of an entirely free choice.

We have taken note of Cannan v. United States, 19 F2d 823, 824, in which the Court of Appeals for the Fifth Circuit said categorically that: "No confession induced by official threat of prosecution is voluntary." In that case the defendant had furnished certain information to the Federal Trade Commission which had subsequently been utilized by the Commission as a basis for prosecution. In its written request for the information sought, the Commission had pointedly called attention to the punishment prescribed by Section 10 of the Federal Trade Commission Act. On the basis of the facts adduced by that Court in its opinion, we are unable to concur in its broad conclusion that all confessions elicited by threat of prosecution are involuntary. Voluntariness, we believe, is a question of fact, and the result in any case must necessarily depend upon its own peculiar circumstances. In one case, a threat of prosecution, taken together with other facts, might produce an involuntary confession. In another situation, such a threat might be held, and not inconsistently, to have produced one which is clearly voluntary. We find the present problem to fall within the latter category. If the view of the court in the Cannan case were universally followed, information in almost any official questionnaire, if confession-like in quality, could not be used against the person who supplied it. Common knowledge tells us such documents as tax return forms customarily include admonitions that untruthful answers may be the occasion for criminal prosecution. We have no fault to find with that practice.

III

Petitioner also contends that there was insufficient evidence of the corpus delicti to support the con-
 ▇ fession's admission and consideration. The evidence established that the owner of the typewriter shipped it, in August 1950, from Tyndall Air Force Base, Florida, to Reese Air Force Base, Texas, to be held for him there at the parachute pool. He gave no one authority to use or to dispose of it. When he arrived at Reese in September 1950, the typewriter was not at the parachute pool. A sergeant assigned to the pool testified he saw a typewriter case there during September 1950, which was similar to that produced by the prosecution. However, he could not identify the case with positiveness. The sergeant testified further that, a few days after he had observed the typewriter case, it disappeared from the pool. On or about October 14, 1950, an air police investigator, in company with the typewriter's owner, recovered it from a pawnshop. It was fully identified by its serial number, and by the fact that the comma key was not in good operating con-

**7**

dition. Testimony of a dealer in used typewriters established the value of the machine in question to be from $60.00 to $70.00.

The testimony of the typewriter owner and the appraiser came in by way of stipulation. All other witnesses testified in person. Petitioner now contends that the testimony of the owner was "the essential evidence" required by the prosecution's case, and that a stipulation as to it amounted to a confession. From this he argues that the stipulation's effect could not have been understood, and that it should not have been accepted by the court. He concludes that, without the stipulation, there was insufficient evidence of the corpus delicti to support the confession.

We shall have more to say of stipulations later. Suffice it to say for the moment that in our opinion appellate defense counsel overvalues the effect of this stipulation. Actually it provided but one link—albeit a strong one—in the chain of evidence needed by the Government. It related to testimony, not to facts. It was not inconsistent with the theory of the defense at the trial. The record reveals, in fact, that defense counsel there took the position there was insufficient evidence to support a conclusion the typewriter found in the pawnshop had ever been in the parachute pool at Reese Air Force Base. Of course, the stipulation in question bore somewhat on that issue, but it was hardly conclusive. In our opinion, its acceptance was quite proper. With the stipulation, there was certainly ample evidence of the corpus delicti.

## IV

We turn now to Charge III, containing six specifications alleging the making and uttering of worthless checks by petitioner. The manner of proof of these offenses is the subject of petitioner's attack here. The testimony establishing certain elements of the offense in the case of four of the six checks was stipulated by the prosecution and defense. As to only one of the allegedly bad checks did a witness appear and testify positively that petitioner wrote and signed the check in his presence, and that he cashed the check for petitioner. One other witness appeared and testified in person that the check cashed by him had been signed in his presence by a person who *said* he was Sergeant Jack Colbert. However, he could not identify petitioner as that person. It was further stipulated that petitioner had no account at the banks upon which the checks in question were drawn.

The Manual for Courts-Martial, U. S. Air Force, 1949, paragraph 140b, provides that:

". . . . A stipulation need not be accepted by the court and should not be accepted if any doubt exists as to the understanding of the accused as to what is involved. If an accused has pleaded not guilty and the plea still stands the court should not accept a stipulation which practically amounts to a confession. . . . ."

A similar provision is contained in the Manual for Courts-Martial, United States, 1951, paragraph 154b. Petitioner here argues that it was error for the court to accept the stipulations relating to four of the six checks in question. He says that the stipulations amounted to confessions evidencing, in the face of his plea of not guilty, a complete misunderstanding of their nature and consequences. From this he concludes that without the stipulations there was insufficient evidence to support the specifications to which they relate.

True it is that stipulations should be scrutinized with extreme caution by defense counsel. In this case it appears —at least on the face of things—that there was a rather extensive resort to their use. However, we do not find in the agreement to the stipulations used in this case, sufficient evidence to warrant a conclusion that defense counsel "stipulated away" petitioner's case. With a single minor exception, they related to testimony, not facts. Cf. Manual for Courts-Martial, U. S. Air Force, 1949, paragraph 140b; Manual for Courts-Martial, United States, 1951, paragraph 154b(2). The one stipulation of fact, namely, that as to the

nonexistence of a bank account in petitioner's name, we regard as of little consequence. The existence or nonexistence of such a fact—because it can be established both definitely and easily—is precisely the sort of matter in which the use of stipulations is contemplated. Were the stipulations concerned with matters of debatable fact, the case might take on a different complexion. We fully recognize, too, that, as a practical matter, stipulations may be defensive tactical instruments of no little importance. What counsel for petitioner had in mind when he entered into the stipulations in question, we cannot, of course, know. However, he may well have thought, and not unreasonably, that he could thereby avoid the danger of an adverse psychological effect produced by a parade of prosecution witnesses. Believing, as we do, that these stipulations were not accepted improperly, we must affirm the findings under Charge III. With the stipulations, it cannot be said that there was insufficient evidence to sustain the court's findings of guilty.

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.