UNITED STATES, Appellant

v.

WILLIE B. JOSEY, Private E-2, U. S. Army, Appellee

3 USCMA 767, 14 CMR 185

770

No. 2808

Decided February 19, 1954

LT COL William R. Ward, U. S. Army for Appellant.
LT COL George M. Thorpe, U. S. Army, and 1ST LT John W. Fuhrman,
U. S. Army for Appellee.

### Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused pleaded not guilty to a charge of larceny in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715, but was found guilty by a properly convened general court-martial. Upon review, the conviction was reversed by a board of review in the office of The Judge Advocate General, United States Army. Thereupon, pursuant to Article 67(*b*) (2) of the Code, 50 USC § 654, the case reached this Court on the basis of questions certified by The Judge Advocate General of the service concerned.

At the accused's trial, the alleged victim, one Wimbly, testified that on the night of December 13, 1952, the accused snatched from the former's grasp a billfold containing $115 and raced away. Wimbly stated that he

next saw the accused the following day. What occurred at that time between Wimbly and the accused is unclear, and has received sharply differing interpretations in the briefs of opposing appellate counsel. So far as we can determine from a close reading of the record of trial, however, Wimbly was accompanied to the accused's barracks by a Criminal Investigation Division agent and a soldier named Howard, an eyewitness to the alleged larceny. Wimbly either said to Private Josey directly or stated to the agent in Josey's presence, "If I get my money back, I don't want to press charges against him." According to Wimbly, "The CID said it was all right." Thereafter the accused "gave me the money and told the CID he was sorry he did what he did, and he was almost drunk when it happened." The defense counsel made no sort of objection to this testimony concerning the comment and action of Private Josey in the presence of Wimbly and the agent. The only other witness called by the Government was the soldier, Howard. He described how, following the theft, Josey had given him $35 "to forget that the incident had happened"—money which Howard subsequently surrendered to law enforcement authorities. Neither evidence nor argument was offered by the defense, and—following detailed instructions by the law officer—the court reached its findings. The two questions certified by The Judge Advocate General relate to the legal effect of receiving in evidence a report of the accused's actions and statements to Wimbly, Howard, and the Criminal Investigation Division operative.

## II

For proper analysis, we shall first consider the question of whether this account should have been received in evidence. Thereafter we shall inquire whether—assuming error in the reception of the testimony—reversal is required. In determining the admissibility of Wimbly's testimony concerning the transaction which took place in the barracks of the accused on the day following the alleged crime, certain preliminary questions must be dealt with

**772**

at the outset. The first of these has to do with whether the accused's conduct and statements on that occasion fall within the purview of Article 31 of the Code, 50 USC § 602. We are sure that they do. It is certainly true that the application of this provision demands some "element of officiality." Cf. United States v. Wilson and Harvey, 2 USCMA 248, 8 CMR 48; United States v. Gibson, 3 USCMA 746, 14 CMR 164. However, it is also clear that such an element was contributed here by the presence of a law enforcement agent, together with his tacit acquiescence in Wimbly's assurance that he would not press charges against the accused. Cf. United States v. Wilson and Harvey, supra; Balding v. State, 77 Okla Cr 36, 138 P2d 132; Wigmore, Evidence, 3d ed, §§ 827–830; Wharton, Criminal Evidence, 11th ed, § 618.

We now address ourselves to the question of whether the language of the accused at this time must be deemed to constitute a confession or a mere admission. If the statement made to Wimbly be regarded as a confession, two conditions to its admissibility exist: (1) the presence of preliminary proof that it was made voluntarily, and (2) an affirmative showing that the accused had been warned of his right to remain silent, as granted by Article 31 of the Code, supra. See Manual for Courts-Martial, United States, 1951, paragraph 140a. No showing is present in the record before us now that either of these conditions was met. Thus we conclude that, if the statement is to be regarded as a confession, it was improperly admitted in evidence. On the other hand, if the statement is to be treated as amounting to no more than an admission, it may be introduced in evidence without preliminary showing of voluntariness and without proof that warning had been accorded the accused —this, in the absence of some indication that it had been involuntarily made. Manual, supra, paragraph 140a; United States v. Seymour, 3 USCMA 401, 12 CMR 157. The converse of this

is true, of course. That is, if there was an appearance of involuntariness, then it was incumbent on the Government, as a foundation for admission, to produce evidence of both voluntariness and appropriate warning.

Was there here some "indication that it was involuntary"? Wimbly's remarks to the accused—comment made with the apparent approval of an agent of the Criminal Investigation Division —certainly tendered a possible benefit in the form of a withdrawal of criminal charges, or at least of an assurance that they would not be pressed  It has been suggested that this offer was made rather for the purpose of stimulating the payment of money to Wimbly than in return for the making of a statement by the accused. That is to say, it is urged that we should distinguish sharply between the action of the accused, on the one hand, and his language, on the other. Thereafter, it is argued that the *statement* of the accused must have been voluntary, since it was generally exculpatory in nature. The difficulty with such a position is that an accused, under Article 31, must be offered a free choice between speaking and remaining silent—not merely the opportunity for an election between verbal exculpation and incrimination. Cf. United States v. Bram, 168 US 532, 18 S Ct 183, 42 L ed 568. Moreover, we cannot fail to observe that in the instant case the challenged statement of the accused and his surrender of money to Wimbly were but parts of a unitary transaction. A return of the money to the alleged victim—being conduct on the part of the accused relevant to the question of guilt or innocence—constituted an admission by him to the same extent that words might have had this effect. Wigmore, supra, §§ 1052, 1060–62. If this admission through conduct was improperly induced it could not have been considered by the court-martial without violating at least the policy enunciated in Article 31 of the Code. Cf. United States v. Rosato, 3 USCMA 143, 11 CMR 143. It follows that, if testimony

as to the return of the money was inadmissible under these circumstances, similarly evidence concerning the accused's oral statement—made as a closely related part of the same incident —was equally beyond the pale—this, however exculpatory the accused may have fancied it to be. We cannot possibly discriminate between the physical and the verbal aspects of the conduct of the accused at the time in question. Both are parts of an indissoluble whole.

This being the case, we must determine whether Wimbly's promise of benefit constituted an indication of involuntariness, which, unless rebutted, would render inadmissible testimony concerning the barracks transaction involving Wimbly, the accused and others. Numerous authorities have not hesitated to brand as inadmissible statements secured through assurances that charges will be dropped, that the accused will not be "bothered" or "hurt," or that he will be released from confinement if he confesses. State v. Hunter, 181 Mo 316, 80 SW 955; State v. Dena, 28 NM 479, 214 Pac 583; White v. State, 70 Ark 24, 65 SW 937; People v. Campbell, 359 Ill 286, 194 NE 533. Moreover, within the criteria announced by this Court, such assurances might conceivably "constrict the will" of an accused to such an extent that he would be "induced to confess guilt of a serious crime which he did not commit." United States v. Colbert, 2 USCMA 3, 6 CMR 3; Cf. Manual, supra, paragraph 140a. It is distinctly possible, for example, that—whether guilty or no—the accused might have chosen to settle Wimbly's claim for the purpose of avoiding a charge of larceny, with its attendant inconvenience, disrepute, and danger. All in all, therefore, we conclude that, although the words and actions of the accused involved are to be characterized as admissions, there was a sufficient "indication of involuntariness," within the meaning of Manual language, to render inadmissible at the trial Private Wimbly's testimony with reference thereto. Thus, it is unnecessary that we determine finally whether the questioned in-

**773**

terview resulted in a confession or an admission. If the latter, then an indication of involuntariness was present, and a foundation of voluntariness and warning was required. If the former, then such a foundation was demanded in any event. Since no such foundation was laid, it follows that Wimbly's testimony in this particular should not have been heard by the court-martial.

## III

Since this testimony should not have been considered at the trial level, and is therefore unavailable to sustain the conviction on review, must it be concluded that a rehearing is demanded? In view of the overwhelming evidence of guilt found in the specific and unshaken testimony of Privates Wimbly and Howard—the larceny's two eyewitnesses—if reversal is to result it must be based either on the doctrine of general prejudice, or on that of its elder brother, military due process.

For the purpose of suggesting the direction in which we propose to travel during the present phase of the case, we shall consider at this juncture a supposititious situation in which, in addition to compelling eyewitness testimony as to the existence of an offense committed by the accused, the prosecution offers in evidence a statement by him which contains an unequivocal acknowledgment of guilt, and therefore clearly constitutes a confession. This confession, we shall assume, is received in evidence quite without objection by the defense. However, be it noted, the prosecution fails completely to show either that a warning as required by Article 31 was given, or that the accused confessed voluntarily. In such an instance, the reception of the statement in evidence must be deemed erroneous, since the Manual requires preliminary proof that the confession was voluntarily made. Manual, supra, paragraph 140a. On the other hand, it would in no way be inferable from the face of the record whether *in fact* the accused had been warned, or whether his admission of guilt had been voluntary or involuntary in character. Accordingly, it could not be determined from the record in the hypothetical case whether the investigators taking the confession had departed from the dictates of military law in these particulars, or whether they had not done so. While the prosecution there would have departed from the *procedural* provisions of the Manual relating to the presentation of preliminary proof of voluntariness before the introduction of a confession, there would be no showing whatever that in obtaining the statement the law enforcement authorities had departed from the protective mandates of Article 31 itself. This being so, may it be said that there exists in the record a basis for applying the doctrine of this Court to the effect that "we regard a departure from the clear mandate of the Article [Article 31] as generally and inherently prejudicial"? We think not. Cf. United States v. Wilson and Harvey, supra.

In the instant case—in connection with our consideration of the barracks transaction as involving an admission—we concluded that there existed an indication of involuntariness. However, in our view the "indication" contemplated by the Manual differs markedly from a clear showing that the confession was involuntary—and involves a wholly different quantum of proof. This difference, we believe, equates roughly to that between a mere suspicion that a certain situation may have obtained, on the one hand, and the offer of convincing evidence to the same effect, on the other. The presence, as here, of a suspicion that an admission is involuntary, and was obtained without proper warning, in the absence of rebuttal, certainly suffices to dictate exclusion—just as in the supposititious case, the confession's exclusion was dictated by an absence of preliminary proof of voluntariness. However, just as in the imagined case an absence of proof was not identified by us with a clear showing of departure from the mandate of Article 31, so in the case at bar, a *suspicion* of involuntariness may not be equated properly to such a departure.

Lest it be thought that we have re-

pudiated the rule of Wilson and Harvey, we emphasize that in that case it was apparent from the record that *no* warning of the accused's rights under Article 31 had been given. In the instant case, on the contrary, the record is inadequate to establish that the accused was *not* fully warned of his rights thereunder, or that his statement was obtained "through the use of" the inducement offered by the victim of the crime. In truth, the record contains items of evidence suggesting in some degree at least that the conduct and language of the accused at the time of the barracks interview were in no serious sense the product of any inducement which may have been tendered him.

We believe the test as to voluntariness to be applied is whether the accused was deprived of his mental freedom to speak or to stand mute. United States v. Monge, 1 USCMA 95, 2 CMR 1; United States v. Colbert, supra. Understandably an alleged deprivation of free choice by psychological coercion is more difficult to measure than one allegedly resulting from the use of physical force, which is inherently coercive. Cf. Stein v. New York, 346 US 156, 97 L ed 1522, 73 S Ct 1077. Nor does the use of promises by the police inevitably reveal that a subsequent confession was unlawfully induced. *Vide* the Stein case, where the evidence revealed that Cooper, one of the accused there, had bargained with New York officials for assurances concerning his brother and father, in return for his promise to "cooperate." This "cooperation" indeed took the form of a confession which paved the way to a death sentence for himself and certain confederates. Yet the possibility that official reassurances might have constituted an unlawful inducement to confess was not even the subject of discussion in the Supreme Court's opinion. Cf. Reeder v. State, 182 Ark 1093, 34 SW2d 451; Wharton, supra, § 620. Instead the Court's majority merely concluded that Cooper's bargaining with the New York authorities had simply operated to "reduce to absurdity" his claim that he had been physically coerced into confession. Admittedly the accused Cooper was an experienced criminal—unlike the accused in the case before us now. Yet there is relevancy in the Supreme Court's remarks at page 185: "The inward consciousness of having committed a murder and a robbery and of being confronted with evidence of guilt which they could neither deny nor explain seems to account for the confessions here."

Of course we must not assume gratuitously that the accused here made use of incriminating conduct and language because of some "inward consciousness" of guilt and a desire to confess and extenuate the offense—after confrontation by strong evidence of guilt. Yet at the same time we may not wholly reject this possibility and assume blindly that the accused was lured into admissions of guilt through indications of Wimbly's forgiving spirit. As did the Supreme Court, we must acknowledge that "it is common courtroom knowledge that extortion of confessions by 'third-degree' methods is charged falsely as well as denied falsely." Accordingly, we must scrutinize such an allegation closely. Especially is this necessary when, as here, the claim is first advanced with seriousness at the appellate level, and as a basis for automatic reversal of a conviction supported by overwhelming eyewitness evidence of guilt. The motivation behind the confession of crime is far too complex a business for us to conclude upon the meager facts before us here that the accused was deprived of his mental freedom to speak or to remain silent. See Inbau and Reid, Lie Detection and Criminal Interrogation, 3d ed, pages 151–187.

Indeed in this reference to meager facts lies perhaps the heart of this opinion's attitude. We are and must ever be especially concerned with demanding a proper factual basis for application of the strong medicine implicit in the doctrines of general prejudice and military due process—that is, with demanding something more than a mere "indication." This is not to say that an accused must assume the witness stand

whenever a confession or admission, possibly involuntary, is offered against him. In the case at bar, however, defense counsel's cross-examination of Wimbly was in no wise exhaustive. Indeed, it produced little more than the information that—although the remark by Wimbly preceded in point of time the surrender of the money and the accused's statement—the former held no opinion on the question of whether a causal relationship existed between these two phenomena. At one point, in fact, Wimbly stated he did not believe such a relation had been present. Defense counsel did not see fit to examine Private Howard about the interview between accused, Wimbly, and the agent, although the record seems to indicate that Howard had heard all of its parts. Nor—so far as we can tell—was any effort made to secure the testimony of the law enforcement agent, either in person or through deposition. Most important of all, defense counsel offered no sort of objection to the testimony which is so vigorously challenged now. Had he done so, this action would doubtless have led to the introduction of additional evidence relating to voluntariness, and almost certainly would have afforded this Court the benefit on review of a conscious ruling by the law officer concerning the admissibility of Wimbly's testimony.

We cannot say with any degree of certainty that the record reflects a calculated course of action on the part of defense counsel, and thus an informed waiver of objection to the testimony now challenged in this Court. Although we have scrutinized the record with care, we cannot suggest with assurance exactly what he was driving at in terms of a rational theory of defense. However, it must not be understood that we seek to criticize him for his failure to object. We are much too unsure in the premises to do this. He was in the difficult position of seeking to defend an accused person against whom there was overwhelming and specific eyewitness evidence of guilt, and he was doubtless simply trying to do the best he could under the circumstances. Although the record is unclear as to his promptings in detail, it cannot be denied that, as

**776**

a matter of reasonable trial tactics, defense counsel *may* conceivably have wished the court's members to hear Wimbly's testimony that the accused had returned the money and had expressed regret over the entire episode —may indeed have wished them to believe that the accused's acts and words in these particulars were wholly *voluntary* in origin. Certainly such testimony would offer a basis for mitigative and extenuative action, and might possibly tend to rebut an inference of criminal intent. However this may be, we do not seek to cause our action in the case at bar to turn on an application of the doctrine of waiver—and it is unnecessary that we consider the matter further.

IV

We have sought to explain in preceding portions of this opinion our reasons for rejecting the conclusion that the record here sufficed in factual content to raise an issue of general prejudice or military due process through demonstrating that an unwarned and involuntary statement by the accused had been received in evidence. Our attention is now directed to a statement contained in the decision of the board of review: "In this factual background we can come to no other conclusion but that the accused was unlawfully induced to make his confession to the CID agent." If this language operates to reflect an exercise by the board of its fact-finding power, we would necessarily be bound thereby, and would be required to adopt as a starting-point the notion that Wimbly's promise of benefit to the accused—acquiesced in by the agent—did lead to the money's return and the accompanying inculpatory remark. However, in light of previous language in the board's decision to the effect that "it cannot be said that he [the accused] was not influenced to confess when told by the victim that the latter did not want to press charges if he got his money back," we tend to interpret the board's decision as chiefly concerned with the question of whether there existed any sort of indication of involuntariness as a matter of law, rather than as amounting to a determina-

tion that involuntariness did exist as a matter of fact. If the latter interpretation of the board of review's decision is the correct one, the conviction must be affirmed—for there is compelling evidence of larceny apart from any confession or admission by the accused to Wimbly and the agent. However, if the Board did make a finding of fact that the accused's mental freedom had been crushed, we might well be bound by such finding, and reversal would be indicated.

Consideration of the general problem requires an understanding of the policies underlying the exclusion of involuntary admissions and confessions from evidence. Traditionally the rationale for exclusion in such cases was the untrustworthiness of statements secured through coercion. See United States v. Monge, supra; Wigmore, supra, § 822. However, the decisions of the Supreme Court have overflowed this rationale and some time ago began to consider the reception in evidence of coerced statements in terms of a violation of the privilege against self incrimination, and thus of "due process." Brown v. Mississippi, 297 US 278, 80 L ed 682, 56 S Ct 461; Ashcraft v. Tennessee, 322 US 143, 88 L ed 1192, 64 S Ct 921, 327 US 274, 90 L ed 667, 66 S Ct 544; Malinski v. New York, 324 US 401, 89 L ed 1029, 65 S Ct 781; Turner v. Pennsylvania, 338 US 62, 93 L ed 1810, 69 S Ct 1352, 1357. See also Lisenba v. California, 314 US 219, 86 L ed 166, 62 S Ct 280; United States v. Monge, supra.

Such decisions involved, for the most part, obvious instances of the "third degree," affronting fundamental concepts of decency and fairness. Exclusion from evidence of statements by the accused was also, in a limited number of special situations affecting Federal trials, bottomed on policy considerations not closely connected either with protecting the privilege against self incrimination or with avoiding use of evidence deemed to be untrustworthy. By way of illustration, statements obtained while an accused was detained illegally by Federal authorities may not be used against him in Federal criminal proceedings—a judicial ruling designed to enforce compliance with Congress' mandate regarding the manner in which arrests are to be effected. McNabb v. United States, 318 US 332, 87 L ed 819, 63 S Ct 608; Gallegos v. Nebraska, 342 US 55, 96 L ed 86, 72 S Ct 141. In some respects this result resembles that obtaining in United States v. Wilson and Harvey, supra—for the exclusion of a proffered statement by the accused was there referred to a specific statutory provision rather than to more general doctrines. Similarly, in the case before us now our reasoning must stem from a particular statutory provision, Article 31(d) of the Code, supra. Under our interpretation, Article 31(d), in its prohibition against the consideration by a court-martial of statements obtained through the use of coercion, unlawful influence or unlawful inducement, embodies a Congressional intention to remove all doubt that servicemen should have the benefit of all elements of the right against self incrimination guaranteed by the Fifth Amendment. Cf. United States v. Monge, supra. In accordance with the holdings of the Supreme Court relating to the protection of that right, we consider that disobedience of the prohibition of Article 31(d) would certainly be generally and inherently prejudicial, and would probably constitute an infringement of military due process. United States v. Clay, 1 USCMA 74, 1 CMR 74. Similarly, we feel compelled to conclude that reception in evidence of an inculpatory statement shown to have been obtained through depriving the accused of his "mental freedom" will necessitate reversal of a conviction, regardless of compelling evidence of guilt other than the statement. Malinski v. New York, supra; but see Stein v. New York, supra.

It is urged, however, that such a result need obtain only where particularly offensive instances of "third-degree" tactics are involved—and admittedly most of the Supreme Court opinions pertaining to the deprivation of due process through use of involuntary con-

fessions have involved claims of marked police brutality. However, we discover no conscious attempt on the part of the Supreme Court to distinguish in this context between coercion, on the one hand, and unlawful influence or inducements, on the other. Consequently, we shall erect no such distinction. Moreover, such a distinction would appear to be illogical—for the reason that as to both coercion and inducements, the issue is the same—that is whether their probable effect in the specific case was to deprive the accused of his mental freedom to choose between speaking and remaining silent. United States v. Monge, supra; United States v. Colbert, supra. In dealing with so basic a protection as the one against self incrimination, it would be highly undesirable—perhaps unworkable—to attempt to cause results to hinge on the *means* by which the will of the accused was constricted in the making of a statement. Nor in safeguarding this right, would we distinguish between admissions and confessions—once it is established clearly that the statement received in evidence had been unlawfully secured.

V

The certified questions, we feel, have been answered. Regardless of whether it constituted a confession or a mere admission, accused's statement made in the presence of the agent was inadmissible—for the reason that Wimbly's remarks produced an unrebutted "indication" of involuntariness. However, to say that this indication rendered the statement inadmissible under paragraph 140a of the Manual is not at all to say that it demonstrated a violation of Article 31 of the Uniform Code. When all is said and done, paragraph 140a expresses but one of several possible approaches to the allocation of the procedural burden in presenting the issue of involuntariness, and of producing evidence with reference to the circumstances preceding the making of a statement. We do not feel that on the facts of record the accused has shown a probability, as opposed to a possibility, that he was deprived of mental freedom in

**778**

determining whether to speak or remain silent. It follows that he has not laid a proper predicate for invocation of either the doctrine of general prejudice or that of military due process.

We are sure that nothing said or done by the board of review in this case precludes us from reversal of its action. In this connection we pretermit any discussion of the distinction between our power to review board determinations of questions of fact and those of mixed law and fact. See United States v. Sell, 3 USCMA 202, 11 CMR 202. Instead, we bottom our conclusion on this point on the notion that—read with care and as a whole—the board's decision reflects no more than a failure to take the distinction elaborated in another portion of this opinion: that between a violation of Article 31 and a violation of certain procedural provisions contained in the Manual. This is certainly matter of law.

Accordingly, the decision of the board of review is reversed and the record returned to The Judge Advocate General for action not inconsistent with this opinion.

QUINN, Chief Judge (concurring):

I concur.

However, I wish to make it clear that, except under unusual circumstances, I would not consider a claim of prejudice resulting from error committed at the trial when proper objection was not made at that level. United States v. Masusock, 1 USCMA 32, 1 CMR 32. Particularly would I adhere to this rule when the evidence admitted without objection is consistent with a theory of defense, or may reasonably be regarded as at least partially beneficial to the accused. But, on the basis of this record, I am satisfied that it is not inappropriate to consider the issues on the merits.

LATIMER, Judge (concurring in the result):

I concur in the result.

I do not concur outright because I am unwilling to join my associates in deciding cases on a rationale which seems

to rely on the strength of the medicine to be administered. I much prefer to use what appears to me to be a less difficult approach. At times it is necessary to make razor-sharp distinctions to escape the effect of previously decided cases, but if so, this litigation, from my viewpoint, does not require such a refinement. The simple rules of law used by the board of review are ample to answer the question posed in this case, and had I joined with the majority of the Court in United States v. Wilson and Harvey, 2 USCMA 248, 8 CMR 48, I would affirm the board of review's decision.

When considered in the light of facts and circumstances, either shown in the record or reasonably inferable therefrom, I have little difficulty in finding that accused's acts, conduct and statement amounted, in law, to a confession. That it was induced by promise of immunity seems beyond cavil. The complaining witness stated, and the statement is not challenged, that the accused conceded his participation in the crime only after he was led to believe by the victim and the Criminal Investigation Division sergeant that he would not be prosecuted if the money was returned. Moreover, the complaining witness wanted to carry out his promise as at the time of trial he so testified. Therefore, I cannot find a satisfactory reason for disagreeing with the board of review's conclusion which is expressed in the following language:

"Considering the intelligence of the accused, his grade and length of service, it cannot be said that he was not influenced to confess when told by the victim that the latter did not want to press charges if he got his money back. Moreover, this conclusion is strengthened when the implied promise of immunity is made in the presence of an investigative authority, a sergeant in the CID, who allegedly said it would be all right if the victim did not want to press charges. In this factual background we can come to no other conclusion but that the accused was unlawfully induced to make his confession to the CID agent (Par. 140a, MCM, 1951). The con-

fession having been made involuntarily it was inadmissible under the quoted provisions of the Manual for Courts-Martial, 1951, and the provisions of Article 31(d) of the Code and failure to exclude it from the members of the court was prejudicial error (United States v. Monge (No. 9), 1 USCMA 95, 2 CMR 1; United States v. Wilson and Harvey (No. 647), 2 USCMA 248, 8 CMR 48, decided 27 February 1953)."

I can, however, assume that the incriminatory acts and statements of the accused amounted to no more than an admission and I arrive at the same conclusion. The Court's opinion holds that because of an indication of involuntariness, it was error to allow the statement to be admitted. As previously stated I find more than an indication; but, in addition, I find another violation of Article 31 of the Code, 50 USC § 602. Here, the record supports a finding that a warning was not given the accused and this renders the statement inadmissible. Article 31 is as follows:

"(a) No person subject to this code shall compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.

"(b) No person subject to this code shall interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

"(c) No person subject to this code shall compel any person to make a statement or produce evidence before any military tribunal if the statement or evidence is not material to the issue and may tend to degrade him.

"(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial."

Subsection (*a*) covers compulsory self incrimination; subsection (*b*) deals with situations where it is sought, by interrogation or request, to obtain a statement; and when that situation exists, the interrogator or requestor is saddled with the burden of warning the accused; and subsection (*c*) treats with another form of compulsion which is limited to degrading and immaterial evidence. Not one of those subsections mentions inducement, coercion, or unlawful influence. With those three subsections in mind, it is important to note the wording of subsection (*d*). The first phrase outlaws any statement obtained in violation of the three previous subsections and each covers a separate and distinct field of inadmissibility. The next phrase, which is disjoined from the first, moves into a fourth and an entirely different field which is well recognized as the area of involuntary statements. Conceding that, at times, failure to warn may be a factor in determining involuntariness, at other times the two have no reasonable relationship to each other. Not only does the Code specifically isolate failure to warn from the other proscriptions of Article 31 and involuntariness, but the Manual does likewise. In Paragraph 140*a*, I find at least two references which support that statement. These are:

". . . some instances of coercion, unlawful influence, and unlawful inducement in obtaining a confession or admission are:

• • • • • • •

"Promises of immunity or clemency with respect to an offense allegedly committed by the accused.

• • • • • • •

"During an official investigation (formal or informal) in which the accused is a person accused or suspected of the offense, obtaining the statement by interrogation or request without giving a preliminary warning of the right against self-incrimination—except when the accused was aware of that right and *the statement was not obtained in violation of Article 31b.*

• • • • • • •

"The admissibility of a confession of the accused must be established by an affirmative showing that it was voluntary, unless the defense expressly consents to the omission of such a showing, but an admission of the accused may be introduced without such preliminary proof if there is no indication that it was involuntary. If it appears that the confession or admission was not *obtained* from the accused but was made by him spontaneously (without urging, interrogation, or request, for example), the statement may be regarded as voluntary. If it does not so appear and affirmative evidence that the confession or admission was voluntary is required, the statement may not be received in evidence unless it is shown that the making of the statement was not induced by a threat, promise, or use of duress amounting to coercion, unlawful influence, or unlawful inducement. Also, in case the confession or admission was obtained by interrogation or request during an official investigation (formal or informal) in which the accused was a person accused or suspected of the offense, the statement may not be received in evidence, if affirmative evidence that it was voluntary is required, unless it is shown that through preliminary warning of the right against self-incrimination, or—*if the statement was not obtained in violation of Article 31b*—for some other reason, the accused was aware of his right not to make the statement and understood that it might be used as evidence against him." [Emphasis supplied.]

The reservations concerning Article 31(*b*) in both quotations would be unnecessary if the codifiers of the Manual intended to always blend failure to warn into involuntariness. It is to be noted that Article 31(*b*) makes a statement obtained by interrogation, and not preceded by a warning, inadmissible; and I conclude Congress intended that prohibition to apply without regard to the presence or absence of other matters touching on the admissibility of the statement. I, therefore, find that error was committed in admitting the

statement contrary to the express wording of Article 31(*b*).

The majority of the Court reaches this same point, but then they are confronted with the rule announced in United States v. Wilson and Harvey, supra. That case influenced the board of review and it is interesting to note how and in what way it has now been modified. There the Court stated:

"We turn now to the problem of whether the erroneous admission of these statements requires that these convictions be reversed, entertaining no doubt that an affirmative answer is required. Where—as here—an element of officiality attended the questioning which produced the admissions, there is more than a violation of the naked rule of Article 31(b), supra; there is an abridgment of the policy underlying the Article which must—we think—be regarded as 'so overwhelmingly important in the scheme of military justice as to elevate it to the level of a "creative and indwelling principle".' United States v. Lee (No. 200), 2 CMR 118. To put the matter otherwise, *we must and do regard a departure from the clear mandate of the Article as generally and inherently prejudicial.* United States v. Berry (No. 69), 2 CMR 114, decided March 18, 1952." [Emphasis supplied.]

The Court now states the rule to be:

". . . However, just as in the imagined case an absence of proof was not identified by us with a *clear showing of departure from the mandate of Article 31,* so in the case at bar, a *suspicion* of involuntariness may not be equated properly to such a departure." [Emphasis supplied.]

What was a clear mandate now becomes a clear departure. Laying aside any arguments over semantics here, there is a violation of the same clear mandate of Congress and no matter what language is employed, it is clear, certain, and positive that the accused was not warned of his rights and that the confession was induced by promised immunity. If, in this instance, there is not both a clear violation and a clear mandate, then I misread a record and misinterpret a statute. I can understand why there should be an effort made to narrow the doctrine of general prejudice, and while I have never subscribed to it, I am in full accord with any restriction which will limit its application. However, in this instance, it is not necessary that we probe further in that field as this case can be disposed of by adopting the compelling evidence rule, a concept which is recognized in most jurisdictions and one which the Court concedes has long been the service rule. In essence that rule is expressed in Article 59(*a*), 50 USC § 646, which states we should not reverse a case in the absence of prejudice, and is herein quoted:

"A finding or sentence of a court-martial shall not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused."

The board of review would have affirmed the finding in this case had it not been for the Court's opinion in United States v. Wilson and Harvey, supra. Being convinced that the doctrine therein pronounced required a reversal here, the board of review so ordered. However, the members were convinced that the evidence of guilt was most compelling and the Court's opinion suggests that my associates agree with that finding. So long as we all agree on that point, there is little necessity of relating the evidence or rationalizing on why the incompetent evidence could not have influenced the findings. All I need say is that the error did not materially prejudice a substantial right of the accused.